**UNITED STATES of America**

v.

**Bienvenido MEJIA, a/k/a "Nido" Defendant.**

**No. 01 CR. 150(VM).**

United States District Court,
S.D. New York.

April 23, 2002.

Jeffrey A. Udell, Assist. U.S. Atty., Mary Jo White, U.S. Atty., Criminal Div., New York City, for U.S.

Roy R. Kulcsar, New York City, Peter Batalla, Bronx, NY, for defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Defendant Bienvenido Mejia ("Mejia") was tried and convicted pursuant to 21 U.S.C. § 846 of conspiracy to violate the narcotics laws of the United States. During its deliberations on April 4, 2002, the jury submitted to the Court a note indicating that it could not reach agreement on a verdict. Because the note violated the Court's specific procedural instructions concerning jury communications to the Court, in that it reported the extent of the split among jurors, the Court returned it to the jury, along with a copy of the specific instructions with which it failed to comply, and did not inform the parties at that time. Instead of resubmitting the note in a form complying with its procedural instructions, the jury continued deliberating and later that same day returned a verdict of guilty. Mejia moved for a mistrial. For the reasons set forth below, the Court denies Mejia's motion.

### I. Background

After a five day trial, the jury in this matter, along with its charge on the sub-

stantive law of the offense, was given instructions as to the manner and procedures governing its communications with the Court. In particular, the Court instructed the jury that: "In any event, do not tell me or anyone else how the jury stands on the issue of the defendant's guilt until a unanimous verdict is reached.... If you are divided, do *not* report how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court." (Tr. at 859–60 (emphasis in original).) This instruction had been reviewed and approved by counsel. Twelve full copies of the jury charge were provided to the jurors for their reference during deliberations. The language referred to is contained on page 37 of the copy provided to each juror.

One full day into deliberations, the jury returned a note which read: "We the jury can't all agree on a verdict!".[1] (Court Ex. 6.) Following disclosure to and consultations with the parties, the Court instructed the jury in open court to return and continue deliberating. (Tr. at 902.) The next day, April 4, 2002, in the presence of counsel and the defendant, the Court provided the parties with a draft *Allen* charge that it proposed issuing should the jury report a third time that it could not reach agreement. (Tr. at 907–08.) Neither party objected to the draft *Allen* charge, or to the Court's contemplation of its delivery in the event of another jury message indicating an impasse.

Later that day, the jury submitted a note requesting review of certain testimony and exhibits on the record. The material was provided to it, following the Court's discussions with counsel, at approximately 1:45 p.m. Subsequently, at 2:10 p.m., the jury sent a note to the Court that again informed of a continuing standstill. But this note contravened the Court's specific instructions set forth above as to the proper form and impermissible content of jury communications. (Court Ex. 14.) The note[2] stated that: "We the Jury *can't* come to an agreement—we have exhausted all possibilities + have had the same vote for the past 2½ days 11—1" and was signed by the foreperson. (*Id.* (emphasis in original).) Given the noncompliance with the relevant procedural charge, the Court, through the Marshal, returned the note, accompanied by a copy of page 37 of the jury charge. (Court Ex. 15.) Marking the page with a highlighter, the Court pointed to the express instruction proscribing disclosure of the numerical split or nature of deliberations among jurors. The particular lines highlighted read: "If you are divided, do *not* report how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court." (Court Ex. 15.) Nothing else from the Court was communicated to the jury in any other manner or form.

The Court did not inform the parties of the jury's 2:10 p.m. note at that time, anticipating that the jury, reminded of the applicable procedure, momentarily would resubmit the note containing the same message but without disclosing the vote

---

1. At the end of the previous day, April 2, 2002, within three hours after commencing its deliberations, the jury sent out a note that stated: "Please give us our cell phones. We can't come to an agreement." The Court informed the Marshal that jurors could not bring their phones in the courthouse. At that point, as it was already after 6:00 p.m., the jury adjourned for the day and agreed to resume deliberations the following morning. This note was shown to the parties at the time and the Court did not address it further because of the jury's immediate adjournment.

2. At the request of the Government, this note, which the Court retrieved from the jury, was later entered into the record.

split. The Court further contemplated that it would then convene the jury and the parties and, if still appropriate, proceed with an *Allen* charge as earlier agreed. Instead, approximately 50 minutes later, at 3:00 p.m., rather than revising and returning its impasse note, the jury submitted another note to the Court that read: "We the jury have *reached a verdict.*" (Court Ex. 12 (emphasis in original).) The Court then assembled the parties in the courtroom.

The Court first apprised the parties of the jury's 3:00 p.m. note informing that it had reached a verdict. At the same time, the Court disclosed the existence of and circumstances relating to the 2:10 p.m. note as described above, without indicating the vote split or its duration. Specifically, the Court informed the parties of its return of the note and the reason for this action, as well as of the Court's transmittal to the jury of the highlighted copy of the specific instructions set forth on page 37. The Court advised that in so returning the note, it had expected that the jury would revise the note to bring it in compliance with the Court's instructions and resubmit it, and that on that expectation the Court delayed informing the parties of the circumstances. (Tr. at 914–16.)

Mejia then moved for a mistrial on the ground that he should have been allowed an opportunity to comment upon the Court's procedure and to request that an *Allen* charge be given at that point. (Tr. at 915.). The Government opposed the motion. The Court denied the request and indicated that it would issue a ruling expressing its reasoning. The jury was then recalled to the courtroom, at which point it rendered a verdict of guilty. The Court polled the jury and found the verdict unanimous. The jury was discharged without objection. (Tr. at 918–19.)

Before rendering its formal decision, the Court *sua sponte* scheduled a post-trial factual hearing to afford the parties further opportunity to examine the events, to question the Marshal and the Court's Deputy Clerk concerning the circumstances surrounding the return of the jury's impasse note and confirm the extent of any communications with the jury that occurred in this connection. At that proceeding, held on the record on April 15, 2002 with the defendant and counsel for the parties present, both the Government and Mejia stated that they saw no need for any additional inquiry regarding the communications in question and that they rested on the record as described by the Court. (Transcript of Post–Trial Hearing, April 15, 2002, at 5–6.) The Court thus finds the facts pertaining to its ruling on Mejia's mistrial motion to be as set forth above.

## II.  DISCUSSION

### A.  DEFENDANT'S RIGHT TO BE PRESENT FOR, OR APPRISED OF, IMPROPERLY SUBMITTED JURY NOTE

A defendant in a criminal case has a fundamental right, protected by the Fifth and Sixth Amendments of the United States Constitution, to be present at all formal proceedings related to the charges brought against him and where the jury is present. *See Shields v. United States,* 273 U.S. 583, 588–89, 47 S.Ct. 478, 71 L.Ed. 787 (1927) (noting the "rule of orderly conduct of jury trial entitling the defendant, especially in a criminal case, to be present from the time the jury is impaneled until its discharge after rendering the verdict."); *Snyder v. Massachusetts,* 291 U.S. 97, 114, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). This right was codified in Federal Rule of

Criminal Procedure 43(a), which provides in pertinent part that: "The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules."

Neither the Constitutional right nor the rule of procedure, however, establishes an absolute standard demanding the defendant's presence in every circumstance. *See, e.g.,* Fed.R.Crim.P. 43(c)(3) ("A defendant need not be present: ... when the proceeding involves only a conference or hearing upon a question of law."). The issue now before this Court concerns the limits of this right.

■ To determine whether a defendant's presence at a criminal proceeding is required by the Sixth Amendment Confrontation Clause and the Due Process Clauses of the Fifth and Fourteenth Amendments, a court must consider whether "a fair and just hearing would be thwarted by [the defendant's] absence." *Hernandez v. Edwards,* 2001 WL 575594, *5 (S.D.N.Y. May 29, 2001) (citations omitted). The defendant's right of presence is clearly established in connection with the court's issuance to the jury of any instructions, supplemental charges or responses to inquiries seeking clarification or guidance regarding the accusations or law pertinent to the jury's charge. Under proper practice pursuant to Rule 43(a), any form of such communication should be conducted on the record in open court in the presence of the defendant and counsel at a time when counsel have a full opportunity to object and make a proper record. *See Rogers v. United States,* 422 U.S. 35, 39–40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *Shields,* 273 U.S. at 588–89, 47 S.Ct. 478; *United States v. Schor,* 418 F.2d 26, 27–30 (2d Cir.1969); *United States v. Ronder,*

639 F.2d 931, 934 (2d Cir.1981); *Krische v. Smith,* 662 F.2d 177, 179 (2d Cir.1981).

■ Failure to adhere to the correct procedure may be reversible error where the court communicates informally with the jury in a manner that may be verdict-urging or otherwise coercive, *see Brasfield v. United States,* 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926); induce further deliberations, *see Rogers,* 422 U.S. at 40, 95 S.Ct. 2091; implicate a juror's qualifications, *see United States v. Taylor,* 562 F.2d 1345, 1366 (2d Cir.1977); supplement the jury's charge on the law or erroneously construe instructions already given, *see United States v. Glick,* 463 F.2d 491, 494 (2d Cir.1972); *Ronder,* 639 F.2d at 934; or in any other way potentially affect the verdict, *see Schor,* 418 F.2d at 30–31.

■ At the other end of the spectrum, the defendant's right to be present does not extend to the delivery of a written note to the jury, consented to by counsel, reiterating verbatim specific instructions already given. *See Auld v. Warden of New Jersey State Penitentiary,* 187 F.2d 615, 619 (1951); *United States v. Grant,* 52 F.3d 448, 449 (2d Cir.1995); *see also Hazel v. United States,* 599 A.2d 38, 47 (D.C. 1991). Nor would it encompass jury communications of an "innocuous" or ministerial nature unrelated to the matters on trial, such as an inquiry regarding the time at which the trial would adjourn on a particular day. *See, e.g., Rushen v. Spain,* 464 U.S. 114, 121, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Taylor,* 562 F.2d at 1366 n. 12.

■ Accordingly, it is not necessarily reversible error if a court departs from procedural formalities in communicating with a jury if it is established that no prejudice to the defendant results. *See, e.g., Rogers,* 422 U.S. at 40, 95 S.Ct. 2091 (stating that "a violation of Rule 43 may in

some circumstances be harmless error" under Fed. R.Crim. p. 52(a)); *Glick,* 463 F.2d at 493 (noting that in appropriate cases application of the harmless error rule may not require reversal); *United States v. Rodriguez,* 545 F.2d 829, 830–31 (2d Cir.1976); *United States v. Blackmon,* 839 F.2d 900, 915 (2d Cir.1988).

Likewise, while of serious concern, even unrecorded *ex parte* conversations between a judge and a juror do not *per se* amount to error of a constitutional magnitude. *See Rushen,* 464 U.S. at 119, 104 S.Ct. 453 (citing *Rogers,* 422 U.S. at 38–40, 95 S.Ct. 2091, *Shields,* 273 U.S. at 588–89, 47 S.Ct. 478 (1927) and *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 81, 39 S.Ct. 435, 63 L.Ed. 853 (1919)); *Taylor,* 562 F.2d at 1366.

In *Rushen,* the Supreme Court acknowledged that some unrecorded *ex parte* communication between trial judge and jury may be a not uncommon aspect of "day-to-day realities of courtroom life." *Rushen,* 464 U.S. at 119, 104 S.Ct. 453. The Supreme Court "emphatically" rejected the lower courts' holding that such communication can never be harmless error. Instead, the Supreme Court instructed that the defendant's fundamental right to personal presence and representation of counsel at all critical stages of the trial must be balanced with " 'the necessity for preserving society's interest in the administration of criminal justice....[R]emedies [for deprivations of this right] should be tailored to the injury suffered ... and should not unnecessarily infringe on competing interests.' " *Id.* at 118, 104 S.Ct. 453 (quoting *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)). Finally, the Supreme Court suggested that the prejudicial effect of an unrecorded *ex parte* communication between a judge and a juror may be dealt with adequately by a post-trial hearing. *Id.* at 120, 104 S.Ct.

453 (citing *Smith v. Phillips,* 455 U.S. 209, 218–19 and n. 8, 102 S.Ct. 940 (1982), and *Remmer v. United States,* 347 U.S. 227, 230, 74 S.Ct. 450, 98 L.Ed. 654 (1954)).

In choosing the course of action it followed in the instant case, this Court perceived that the situation involved not only the defendant's right of presence, but, as in *Rushen,* other competing values implicating society's interest in the administration of criminal justice—in particular, protecting the privacy of jury deliberations. As the Second Circuit has noted: "[J]uror privacy is a prerequisite of free debate, without which the decision making process would be crippled." *United States v. Thomas,* 116 F.3d 606, 618–19 (2d Cir. 1997).

■ The standard instruction courts issue to juries not to disclose to anyone, before their verdict is announced in open court, how they stand on the guilt or innocence of the accused, is given to serve a vital purpose: to safeguard the integrity of the process and protect the safety and well-being of individual jurors and the jury as a whole from intimidation and other corrupting pressures associated with "impertinent", premature and even post-verdict publication. *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *see also McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *United States v. Thomas,* 116 F.3d 606, 619 (2d Cir.1997) ("[T]he rule of secrecy is fundamental to the effective operation of the jury system ....").

Improvident disclosures of the jury's deliberations and votes, especially absent allegations of jury misconduct, may expose jurors to undue influences from their fellow panel members or external forces, and even to improper coercion by the court itself. As regards obtaining such premature information, the Supreme Court has declared that "we do not think that the

proper administration of the law [requires] [sic] such knowledge or permits such a question on the part of the presiding judge. Cases may easily be imagined where a practice of this kind might lead to improper influences...." *Burton v. United States,* 196 U.S. 283, 308, 25 S.Ct. 243, 49 L.Ed. 482 (1905); *Clark,* 289 U.S. at 13, 53 S.Ct. 465 ("Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world."); *Brasfield,* 272 U.S. at 450, 47 S.Ct. 135; *Shields,* 273 U.S. at 588–89, 47 S.Ct. 478; *see also United States v. Spitz,* 696 F.2d 916 (11th Cir.1983) (reversible error to identify juror hold out and force her to stand during *Allen* charge).

Presented with a note that, in direct contravention of the jury's procedural instructions, disclosed information regarding the numerical split and duration of its disagreement, this Court weighed several options.

First, the Court could have called in the parties and counsel and read the jury's note on the record in its entirety, thus revealing the nature and extent of the jury's discussion. It was the Court's view that publishing the entire note in open court at that stage posed a risk of coercing the jury by focusing attention on the individual jurors and perhaps intensifying the jury majority's pressure on the minority or holdout. In this situation, had the Court apprised the parties of the note and proceeded to issue an *Allen* charge, all parties (and members of the public) would have been aware of the 11 to 1 split. During the proceedings, public scrutiny would have been centered on the jurors as individuals. It would have been clear to the holdout juror, and to the other jurors as well, that the Court, the parties and persons in the audience were aware of the

jury's deliberations history and vote. Even if unidentified in open court and thereby pressured indirectly, the holdout juror, about whom no suggestion of impropriety or failure to deliberate had been made, would have sensed the isolation and weight of concentrated attention and felt the pressure of the *Allen* charge keenly. The jurors in the majority might have taken the *Allen* charge as the Court casting its influence on their side and as a vindication of their position. Thus, no matter how balanced and fairly worded the Court's instructions, the circumstances could have engendered a potentially coercive effect. *See United States v. Robinson,* 560 F.2d 507, 525 (2d Cir.1977) (Oakes, J., dissenting).

Disclosure of the whole text of the jury's impasse note here would have been appropriate on a premise that under Rule 43(a) the defendant has a right not only to be present and be represented by counsel at all stages of the trial where the jury is present, but to be informed of the precise content of every communication to the court from the jury. This Court does not read the defendant's right of presence to encompass absolute disclosure of communications to the court revealing the extent of the jury's division or nature of deliberations. *See Burton,* 196 U.S. at 308, 25 S.Ct. 243; *Brasfield,* 272 U.S. at 450, 47 S.Ct. 135; *Thomas,* 116 F.3d at 618 ("As a general rule, no one—including the judge presiding at a trial—has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror.")

Assuming the defendant has a right to know of a jury's message communicating an impasse, but not of the extent and duration of the jury's division, the Court could have assembled the parties and informed them of the deadlock but not of the numerical split, and then have either (1)

returned the note with a request for a complying communication that could have triggered the *Allen* charge, or (2) at that moment summoned the jury and delivered the *Allen* charge that had already been agreed upon as the course the Court would follow in this eventuality. *See Ronder*, 639 F.2d at 934 (instructing that it may be appropriate in some circumstances to disclose a jury note to counsel in camera "or even to make some redaction"); *see also Robinson*, 560 F.2d at 511 (noting that the trial court informed the parties of a jury note advising the court of a deadlock but did not disclose the precise division). The acuity and wisdom hindsight always confers to amend the bygone can enhance even the keenest eye. The Court acknowledges that, edified by the gloss and clarity gained through the looking glass, this course perhaps would have been procedurally unassailable and substantively beyond cavil or reproach. As discussed below, however, whether or not under the circumstances an *Allen* charge at that point would have been in the best interests of Mejia is at least arguable.

In any event, by the Court's returning the jury's improper note with a reminder of the correct procedure it should follow to send its message, the Court fully anticipated that the jury would promptly resubmit a complying note reiterating its failure to agree. Such response would have placed the situation in precisely the same posture that would have prevailed had the Court first apprised the parties of the impasse: assuming the Court still deemed it warranted, the jury would have been reconvened in open court in the presence of the defendant and counsel to receive the *Allen* instruction. *See Robinson*, 560 F.2d at 517 (finding no prejudicial error "[s]ince the court was already aware that the jury stood 11–1 for conviction and no new ques-

tions of law were raised by the note, there was little or no need for [the trial judge] to consult with counsel concerning his response."). Instead, unexpectedly, the jury used the time to continue to deliberate, a result which here could have obtained whether the Court had returned the note with or without its prior disclosure to counsel. This turn of events may be reasonably considered tantamount to the jury's having withdrawn its impasse message in light of its continued deliberations.

Mejia objects to the procedure the Court followed, citing it as grounds for a mistrial, on the ground that the failure to disclose the jury's impasse note immediately and the manner of the Court's response deprived him of an opportunity to reassert that the *Allen* charge should proceed as earlier agreed between Court and the parties. Whether the handling of this situation, assuming it violated Mejia's Rule 43(a) right of presence, entitled him to a new trial depends upon whether the Court's communication with the jury was demonstrably prejudicial to him.

Mejia's assertion that the Court's nondisclosure affected his right to press for an *Allen* charge is not persuasive or sufficient to evidence prejudicial effect compelling a new trial. The Court and the parties had already agreed that upon the jury reporting another impasse the Court would issue an *Allen* instruction. Given the timing and sequence of events, it is most probable that the jury's 11 to 1 division favored conviction. Mejia's argument assumes either that the split was otherwise, or that, regardless of the jury's alignment, an *Allen* charge, if given, may have produced an acquittal.

Such speculation does not comport with the realities of the situation and does not satisfy the threshold of prejudice.[3] In

---

**3.** A deprivation of a defendant's right to be    present is analyzed under the harmless error

fact, on the more likely supposition that the jury's 11 to 1 majority had steadfastly favored a guilty verdict, an *Allen* charge probably would have worked against Mejia's interests, so that it is at least conceivable that the Court, aware of the instruction's effect on a jury so divided, could have elected not to proceed with the *Allen* option. *See United States v. Flannery*, 451 F.2d 880, 883 (1st Cir.1971) (observing that the *Allen* charge "[l]ike dynamite...should be used with great caution, and only when absolutely necessary."). In that event, the jury's having broken the deadlock on its own, thus obviating the need for an *Allen* charge, achieved the same outcome, and the overall effect of the Court's handling of the jury's first note could not have been any more prejudicial than the alternative Mejia suggests.

The controlling facts in this case are unlike those that prevailed in circumstances in which an *ex parte* communication from the court to the jury was found to constitute reversible error. Here, there was no inquiry initiated by the Court itself, as in *Brasfield*, requesting information about the nature of the disagreement and numerical division among the jurors. *See Brasfield*, 272 U.S. at 450, 47 S.Ct. 135. Rather, the jury, contrary to its instruction, volunteered the information. The court's communication, rather than intimidate the jury, was intended to protect another value vital to the proper administration of justice: the privacy of the jury's deliberations. That the jury offered the information does not mean that the Court should have adopted a course that conceiv-

ably may have engendered pressures by the parties urging disclosure, in open court and on the record, of the jury's split, thus potentially compounding the jury's procedural departure.

Moreover, the Court's response did not create the kind of verdict-urging coercion that has compelled reversal in other cases. In *Shields*, for instance, the Supreme Court reversed a conviction where the trial judge, responding that a jury note reporting jury agreement as to the guilt of some defendants but not others, had sent a written message to the jury, without affording counsel the opportunity to comment on the note. The trial court instructed the jury that it: "will have to find also whether [the three defendants the jury disagreed about] are guilty or not guilty." *Shields*, 273 U.S. at 587, 47 S.Ct. 478. That instruction was new, drafted by the judge alone and sent *ex parte*, and had the effect of "coercing the jury into rendering a verdict which they were plainly reluctant to return." *Id.* In essence, the judge in *Shields* drafted his own verdict-urging charge which did not constitute an evenly weighted *Allen* charge.

In the case at bar, however, the jury's note was not tantamount a request for clarification of questions of law or for further substantive instructions and the Court's response was a mere reminder of the procedure already charged for jury communications that did not touch upon the applicable law nor the jury's duty to deliberate through impasse. *See Schor*,

standard set forth in Fed.R.Crim.P. 52(a). *See Schor*, 418 F.2d at 30; *United States v. Arriagada*, 451 F.2d at 488 ("When all the circumstances about the communications are known and when it can be said with certainty that no harm has been done it would be insisting on form to reverse.") (internal citations omitted); *see also United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir.2000) (holding

that violations of Fed.R.Crim.P. 43(a) during voir dire are "trial errors" rather than "structural defects" and are analyzed under a harmless error standard). Harmless error is that from which no prejudice or reasonable possibility of prejudice results. *See Arriagada*, 451 F.2d at 489 (citing *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *Schor*, 418 F.2d at 30.

418 F.2d at 30 (noting that, as to a jury inquiry which the court *ex parte* answered correctly and consistent with earlier discussions with the parties, little would be added by repetition of the instruction in open court in the presence of the defendant); *Glick*, 463 F.2d at 495 ("This is not a case ... where supplemental instructions on an issue of law delivered out of the presence of the defendant could be considered harmless because they merely repeated instructions previously given in his presence . : ...") (citing *Arriagada*, 451 F.2d at 487).

Also, in *Rogers*, the Supreme Court found it reversible error for a trial judge to suggest to a possibly deadlocked jury that it could recommend leniency in sentencing, although in fact the jury's recommendation would play no role at the sentencing phase. *See Rogers*, 422 U.S. at 40, 95 S.Ct. 2091. That communication was error because it "strongly suggested that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise." *Id.* at 40–41, 95 S.Ct. 2091. Thus, the judge's instruction misled the jury. Furthermore, a coercive effect could be inferred by the five minute interval in which the jury returned a verdict after receiving the Court's response. *See id.* at 37, 95 S.Ct. 2091. Such inducement of deliberations is not the issue now before the Court because, again, the Court merely reminded the jury of its prior instruction regarding the proper form and impermissible content of jury communications with the Court. On this record it is fair to infer that after it sent its note, and both before and after receiving the Court's response, the jury chose to use the time productively to deliberate further until it resolved the disagreement on its own.

Finally, here the Court's communication itself was neither intended to nor could reasonably be construed to have induced jury deliberations. *See, e.g., Krische*, 662 F.2d at 179–80. In *Krische*, the jury was being kept late on its first day of deliberations when it sent the judge a note at 8:10 p.m. indicating that it was deadlocked. The judge, without notice to counsel or the defendant, sent a court officer to the jury room to instruct the jury to continue deliberations because "it's not soon enough." *Id.* at 178. On its face, that response conveyed a purpose or necessarily had the effect of inducing further jury deliberation unassisted by the informed consent of the parties regarding the Court's instruction. Eighty minutes later the jury returned a note saying it had reached a verdict. The judge informed the parties of the previous note at that time, and defense counsel did not object. *See id.* The defendant was convicted.

The Second Circuit granted the defendant's subsequent writ of habeas corpus because it found the trial court's procedure was prejudicial and violated defendant's due process rights. The Court found that the prejudice stemmed from the timing of the notification of counsel, which rendered counsel unable to effectively assist his client or draft an appropriate *Allen* charge. *See id.* at 180.

The similarity between the situation in *Krische* and in the case at bar begins and ends with the issue of timing. Here, the jury on its own initiative apparently deliberated for fifty minutes after submitting the deficient note. In addition, two hours earlier the jury had asked for and recently received transcripts of certain testimony from witnesses the prosecution considered crucial to its case. (Court Ex. 9.) Previously, the jury already had been given copies it had requested of every document entered into evidence during the course of

the trial. (Court Ex. 1.) Thus, the jurors had sufficient materials to continue to review during the approximately one hour that elapsed between its impasse note and the later one advising of its verdict.

· Finally, unlike the instruction in *Krische*, the Court did not develop a supplemental instruction *sua sponte* or otherwise direct or encourage further deliberations. Rather, the Court reminded the jury to comply with its previous instructions in reporting its impasse. A reasonable inference for the jury to have drawn from that communication was the one intended: for it to rewrite and resubmit its message in accordance with the procedural instruction highlighted on the copy of page 37 that the Court forwarded with the returned note. The instruction does not appear in any way to be verdict-urging. Indeed, it was carefully tailored to address only the potential prejudice that might arise from premature publication of the jury's split. Had its rift remained as intractable as its impasse note had reported, the jury's most probable course would have been to resubmit a revised note. That the jurors arrived at unanimity without transmitting a complying note, thereby obviating the *Allen* charge issue, was unexpected. The Court's post-verdict polling revealed no dissension from that unanimity

and the jury was dismissed without objection.

The Court is not persuaded that the parties lost a real opportunity to convince the Court that some other or different response would have been more appropriate under the circumstances. In some cases, such a loss has been held to be reversible error. *See United States v. Parent*, 954 F.2d 23, 25–26 (1st Cir.1992). Here, the parties had already discussed and agreed upon the contents of an *Allen* charge. As discussed above, the Court's response to the jury's note was grounded on the goals of protecting the secrecy of the jury's deliberations and facilitating free debate among them.

Mejia's counsel specifically asked the Court to consider the *Ronder* case, already cited above by the Court, in connection with this ruling. *See Ronder*, 639 F.2d at 931.[4] The facts in *Ronder* are easily distinguishable and as such the case does not support Mejia's motion for a mistrial. In *Ronder*, the jury informed the trial court by note that it was at an impasse after a half day's deliberation. After a brief colloquy with counsel, the judge instructed the jury to return the next day and continue deliberations. On the third day of deliberations the jury sent a note that the Second

---

**4.** In response to Mejia's counsel's citation, the Government argued that the circumstances presented by the instant case more closely resemble those in *Blackmon*, 839 F.2d at 915. In that case, the jury sent a note concerning the schedule for deliberation and one juror's need to leave at 6:30 p.m. Without consulting counsel, the judge sent back a note that read: "Which juror, and is it absolutely impossible to work this evening? I said to you yesterday that we would work tonight, if necessary, and I feel that we must." *Id.* The jury did not respond to the court's inquiry and instead returned a verdict over two hours later. On appeal, the Second Circuit found the trial court's communication with the jury was harmless because the jury's note related only

to the timing of deliberations on a given day, and the judge's response could not fairly be construed as coercing the jurors to resolve differences, none of which had been reported.

The Government also cited factually similar cases from other circuits where an error in handling a jury note was found to be harmless. *See United States v. Maraj*, 947 F.2d 520, 526 (1st Cir.1991); *United States v. Sylvester*, 143 F.3d 923, 928–29 (5th Cir.1998); *United States v. Harris*, 9 F.3d 493, 499 (6th Cir.1993); *United States v. Coffman*, 94 F.3d 330, 336 (7th Cir.1996); *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir.1995); *United States v. Frazin*, 780 F.2d 1461, 1469–71 (9th Cir.1986); *United States v. Gomez*, 67 F.3d 1515, 1527–30 (10th Cir.1995).

Circuit characterized as "firmly reporting a deadlock: 'We cannot reach a verdict on either charge.'" *Id.* at 932. The judge, without informing counsel of the note or inviting the parties' comment, recalled the jury and gave a verdict-urging charge. The instruction the judge drafted did not constitute a balanced *Allen* charge. Rather, as the Second Circuit found, it "might have given the jury the impression that the Government's interest in a verdict was more meritorious than the purely personal concerns of the defendant." *Id.* at 932–33. Defendant moved for a mistrial.

Later, during a conference with counsel on the motion for mistrial, the judge received a second note from the jury. That note informed the Court that the jury had made some progress, but that one juror "complains of a headache" and "feels that he or she is being badgered because we ask for evidence on their position to discuss." *Id.* at 933. The judge informed counsel of the existence of the note, but declined to read its contents when specifically asked to do so. *See id.* The parties agreed to the Court's issuance of an *Allen* charge in response. The judge recalled the jury and delivered the instruction.

At that time, the judge also mentioned a third jury note, not previously disclosed to counsel, which concerned the relationship between and the substance of the charges: "Is it possible to bring a verdict of guilty to charge 1 (the conspiracy offense) and not guilty to charge 3 (the substantive offense)? Some of us feel that the two are tied together and that the same verdict has to be reached for both. Maybe if you would redefine both charges for us and explain how much involvement constitutes guilt.". *Id.* at 933. Though not having revealed the third note to counsel, the judge "responded by pointing out that the two charges against Ronder were 'separate' and by reviewing the elements of

both the conspiracy and the substantive offenses", and providing some editorial comments on each. *See id.*

Thus, the facts at issue in *Ronder* were far more grave than those presented here. To begin, the first note submitted by the *Ronder* jury was proper in that it did not disclose any information that might taint the proceedings. In response, the trial court drafted its own verdict-urging charge without first consulting counsel and issued it *sua sponte*. Later, the judge withheld from counsel a third note that concerned the substance of the charges, construed the law without comment from counsel and issued supplemental jury instructions. The judge further speculated and opined on what elements might be confusing the jury. *Id.* at 933. Significantly, as aggravated as these circumstances appear, and while finding error that demanded a new trial, the Second Circuit noted that "the issue is close." *Id.* at 934.

By the *Ronder* standard, in this Court's assessment, self-directed though it may be, the issue in the matter at hand cannot fairly be said to be even close. The jury note presented did not simply state that the jury had reached an impasse. Such a note would have been properly admitted on the record. Rather, the jury volunteered the history of its deliberations and vote, which the Court previously instructed it not to do. Thus, the note at issue here is significantly different from the first and third notes in *Ronder*.

There is another significant difference between the second note in *Ronder*, which informed the Court of the jury's deliberations, and that in the case at bar. In *Ronder*, that note contained an allegation of juror misconduct, asserting that the holdout juror refused to deliberate and felt "badgered." *Id.* at 933. Here, however, there was no indication whatsoever that

the jurors were not deliberating fairly and properly. Thus, the *Ronder* court was faced with some obligation to make inquiry to determine whether any juror should be dismissed "for cause" pursuant to Fed. R.Crim.P. 23. *See Thomas,* 116 F.3d at 606. Here, however, the Court was faced with no reason to reveal prematurely any part of the jury's deliberation or vote.

In sum, given that the jury note was inconsistent with the Court's instructions, and that its publication in its entirety potentially might have been prejudicial to the defendant, it is not immediately apparent how the Court's departure from procedure in this case would amount to error of a constitutional dimension.

## III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that Mejia's motion for a mistrial is DENIED.

**SO ORDERED.**