**UNITED STATES of America,
Appellee,**

v.

**Bienvenido MEJIA, Defendant–
Appellant.**

No. 02–1767.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 2, 2003.

Decided: Jan. 29, 2004.

Tracy W. Young, New York, N.Y. (Lisa Scolari, on the brief), for Defendant–Appellant.

Jeffrey A. Udell, Assistant United States Attorney for the Southern District of New York, New York, N.Y. (Christopher J. Clark, Assistant United States Attorney, of counsel; James B. Comey, United States Attorney, on the brief), for Appellee.

Before: CARDAMONE, MINER and CALABRESI, Circuit Judges.

MINER, Circuit Judge.

Defendant-appellant Bienvenido Mejia appeals from a judgment of conviction and sentence entered after a jury trial in the United States District Court for the Southern District of New York (Marrero, *J.*). Mejia was convicted of conspiracy to distribute, and possess with intent to distribute, more than five kilograms of cocaine, in

violation of 21 U.S.C. § 846. Prior to the jury verdict, Mejia had moved for a mistrial predicated upon the ex parte response of the District Court to a message from the jury. The message indicated that the jury was at an impasse and set forth the vote of the divided jury. Mejia contends on appeal, as he did in the District Court, that the ex parte response was inappropriate, substantially erroneous and effectively induced the jury verdict. We agree and vacate the judgment of conviction.

## BACKGROUND

Mejia was convicted largely on the trial testimony of Victor Medina and Ramon Nunez, both of whom described their participation, as well as the role of Mejia and others, in a cocaine smuggling conspiracy. Prior to giving their testimony in the trial of Mejia, both Medina and Nunez pled guilty to conspiracy to distribute and possess with intent to distribute cocaine. Medina described the methods by which produce companies would receive from the Dominican Republic shipments of produce within which cocaine was secreted. One of the companies, known as Neuvo Renacer, was owned by Mejia. Medina testified that he unloaded cocaine from shipping containers sent to Mejia's company on three separate occasions. On each such occasion, according to Medina, Mejia would pick up Medina and others in his van at a gas station in Manhattan and drive them to the rear yard of the Bronx Terminal Market. There, Mejia would open a shipping container with a key and provide the necessary tools for the removal of the cocaine from behind the door panels of the container. The space left vacant by the cocaine was filled with foam mattresses brought by Mejia. The door panels then were restored.

Medina also testified that he had made payments to Mejia at the direction of a co-conspirator, including one payment of cash in the sum of $70,000 contained in a duffle bag. Sometime after the payment, a customs search of Mejia as an outbound passenger on a flight to the Dominican Republic at JFK International Airport revealed in excess of $70,000 in undeclared currency. Medina, at the time of his arrest, had in his possession an address book that included the pager number of Mejia. Like Medina, Nunez unloaded cocaine out of shipping container doors, performing this service for Mejia three or four times. He also delivered money to Mejia, on one occasion receiving a box containing approximately $160,000 in cash for delivery to Mejia. Telephone records indicated several contacts between a cellular telephone number registered to Mejia and a cellular telephone belonging to Nunez.

Trial testimony of law enforcement agents included the description of two shipping containers seized by customs agents. The shipments were sent to Del Campo Produce in Manhattan by a company in the Dominican Republic known as Exportadora de Productos Agricolas Nacionales ("Exportadora"). The shipping documents listed the cargo of the seized containers as coconuts, oranges, dasheens and pumpkins. After the agents discovered and removed the cocaine, they reassembled the containers and fitted them with electronic tracking devices and alarms to be activated on the opening of the containers. The containers then were trucked from Port Elizabeth, New Jersey to the rear yard of the Bronx Terminal Market. The containers had been under surveillance for one day when the alarm devices were triggered. The officers moved in and discovered men inside the containers, including Medina and Nunez, engaged in the removal of cocaine.

In addition to the testimony given by Medina and Nunez, Mejia's role was demonstrated by other evidence, including the records of Mejia's produce company. Out of seventeen shipments to the United States by Exportadora in the year 2000, thirteen were sent to Mejia's company, Nuevo Renacer, and three were sent to Del Campo Produce. Indeed, Neuvo Renacer received only fourteen shipments of produce for the entire year. The Government's evidence also demonstrated that containers used in the year 2000 by Mejia's company had been located by customs officials in the Ports of Miami, New Orleans, Atlanta and New Jersey. The doors of each container had been hollowed out and stuffed with foam mattresses in the manner described by Nunez and Medina. Additionally, the odor of narcotics was detected through canine identification in two of the containers. The sole witness for Mejia was Domingo Rivas, who was familiar with Mejia's produce business and testified that the business had gross annual sales of over $1 million dollars.

On the sixth day of Mejia's conspiracy trial, the court instructed the jury prior to deliberations and provided a copy of its instructions to each of the jurors. No objections were raised, and the jury began deliberations immediately thereafter. After requesting all the trial exhibits, the jury sent out the following note: "Please give us our cell phones. We can't come to an agreement." The court responded through the Marshal that the jurors could not have phones in the courthouse. Shortly thereafter, the court adjourned for the day, the jury having agreed to resume deliberations the next morning. On the second day of deliberations, the jury sent out two notes with questions regarding Mejia's liability for the contents of .the shipping container. These notes were sup-

plemented by a fourth question, asked by the foreman in open court. The District Judge immediately responded to that question, apparently without objection.

The jury continued to deliberate and at approximately 4:00 P.M. sent out the following note: "We the jury can't all agree on this case!" The court disclosed this note to the parties and consulted with them as to an appropriate response. The court proposed to ask the jury to continue its deliberations and advised the parties that it would consider giving the standard "*Allen* charge"[1] if the jury remained divided thereafter. Accordingly, the following instruction was given in open court, without objection:

> The court recognizes that unanimity is a very difficult concept to apply and to reach under any circumstances, and that under these circumstances where the stakes are so high for all concerned it is even more difficult. But it is the duty of the jury to make the effort that is demanded by the circumstances and to in this case perhaps try again and see to what extent further exchange, discussion [and] deliberations among yourselves might be able to bear an outcome that represents the view of all the jurors.

Sometime after receiving that instruction, the jury sent out a note indicating a desire to break for the day at 5:00 P.M. and resume deliberations the next day at 10:00 A.M. The court thereafter was adjourned.

The next day, the third day of deliberations, the jury sent out a note asking for supplies, which apparently were furnished. Thereafter, the court provided a draft of an *Allen* charge to the parties, proposing to issue it if the jury should again report disagreement. Neither party objected to the proposal, which was made in the presence of counsel and Mejia. Later that

**1.** *See Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

day, a jury request for certain testimony and exhibits was fulfilled without objection following discussion between the court and counsel. This occurred at about 1:45 P.M.

At 2:10 P.M., the jury sent to the court the following note, signed by the foreperson: "We the Jury *can't* come to an agreement—we have exhausted all possibilities & have had the same vote for the past 2½ full days 11–1." Responding to this note without consulting the parties, the court sent to the jury a copy of page 37 of its instructions, having marked with a highlighter the following two sentences found on two different parts of the page: "Do not specify what the verdict is in the note.... If you are divided, do *not* report how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court." It was the intention of the court, as later expressed in its written opinion, that the note be returned without the report of the vote, whereupon the *Allen* charge would be given. However, at about 3:00 P.M., the jury sent a new and different note. It stated: "We the jury have *reached a verdict.*"

The court then assembled the parties in the courtroom, advised them of the 3:00 P.M. verdict note as well as the 2:10 P.M. note to which the court had responded without consultation with counsel and advised them that there had been a split among the jurors, but did not reveal the actual vote. The court also advised the parties of its expectation that the 2:10 P.M. note would be returned without disclosure of the division, and that the court had delayed notifying the parties because it had anticipated a revised note.

Contending that he should have had the opportunity to comment on the 2:10 P.M. note and to request the *Allen* charge in response to it, Mejia moved for a mistrial. The court denied the motion, stating that a ruling would be issued explaining its decision. The jury was called into the courtroom, a verdict was rendered finding Mejia guilty of the narcotics conspiracy with which he was charged, and that it was reasonably foreseeable to Mejia that the conspiracy involved more than five kilograms of cocaine. A poll of the jury revealed a unanimous verdict. Four days after the verdict was rendered, the District Court held a post-trial conference regarding the motion for mistrial. At that conference, the court marked some of the jury's notes as exhibits and reviewed the court's conduct relative to its response to the 2:10 P.M. deadlock note. The court "stresse[d] that there was no substantive communication of any kind" in its response "that would in any way in the [c]ourt's view be considered prejudicial to [Mejia]."

A week later, the court held another post-trial conference at which it provided a further explanation for the events leading up to the jury's verdict and observed that it had expected the jury to forward a note complying with the court's response to the 2:10 P.M. note rather than render a verdict. Approximately one week later, the court issued a comprehensive written opinion discussing in detail the basis for its denial of the mistrial motion. *See United States v. Mejia,* 200 F.Supp.2d 322 (S.D.N.Y.2002). In its written opinion, the court acknowledged that there were two alternative (and better) approaches that it might have taken: assemble the parties and inform them of the deadlock, but not the vote, and then either (i) return the note with a request for another note that omitted the vote, thereby triggering the *Allen* charge, or (ii) summon the jury and deliver the agreed-upon *Allen* charge. *Id.* at 328–29.

The court found, however, that "Mejia's assertion that the [c]ourt's non-disclosure affected his rights to press for an *Allen*

charge is not persuasive or sufficient to evidence prejudicial effect compelling a new trial." *Id.* at 329. The court also found that reading the entire note into the record would have intensified pressure on the hold-out juror, *id.* at 328, that it was likely that the 11–1 majority favored conviction and that an *Allen* charge would have "worked against Mejia's interests," *id.* at 330. Opining on the question of inducement, the District Court determined that "the [c]ourt's communication itself was neither intended to nor could reasonably be construed to have induced jury deliberations." *Id.* at 331. After a thorough analysis of our precedent, the learned District Court summarized its conclusions as follows: "In sum, given that the jury note was inconsistent with the [c]ourt's instructions, and that its publication in its entirety potentially might have been prejudicial to [Mejia], it is not immediately apparent how the [c]ourt's departure from procedure in this case would amount to an error of a constitutional dimension." *Id.* at 334.

## DISCUSSION

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." It has been said that "[i]f one were to translate the Confrontation Clause into language in more common use today, it would read: 'In all criminal prosecutions the accused shall enjoy the right *to be present* and to cross-examine the witnesses against him.'" *Dutton v. Evans,* 400 U.S. 74, 95, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (Harlan, J., concurring) (emphasis supplied). This expansive interpretation of the constitutional provision has been codified in Fed. R.Crim.P. 43(a), which, at the time of Mejia's trial, included the following language: "The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence." [2] The "right to be present" has been extended to require "that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds." *United States v. Ronder,* 639 F.2d 931, 934 (2d Cir.1981) (citing *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975)).

In *Ronder,* we emphasized the importance of the input of counsel in a court's response to jury messages. There, the trial judge did not disclose to the parties the contents of three notes submitted to the jury on the final day of deliberations. The first note reported a deadlock, and the trial judge responded by advising the jury that a verdict was important because the Government was anxious to see the law enforced and because the defendant had gone through an "ordeal" and was entitled to a verdict. *Id.* at 932. The second note reported that there was a juror who felt "badgered" and refused to discuss the issues. *Id.* at 933. The third note, of which counsel was unaware, asked for a re-definition and an explanation of the conspiracy and substantive charges presented and inquired as to the "involvement" necessary to constitute guilt. In response to the second note, the court gave an *Allen* charge urging unanimity and, at the same time, reviewed the elements of the conspiracy charge and the substantive charge, noting that they were "separate." *Id.*

---

2. The amendment to Rule 43 on December 1, 2002, following Media's trial, effected only stylistic changes in the language of the rule.

At this point, we pause to observe that the Supreme Court in *Allen* described with approval an instruction, given by a trial court urging a jury verdict, which in substance was:

> that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if the much larger number were for a conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Allen*, 164 U.S. at 501, 17 S.Ct. 154.

In setting aside the verdict and remanding for a new trial in *Ronder* because of the ex parte communications, we analyzed the ways that error could have been avoided through discussion with counsel:

> Had the first note been discussed with counsel, the phrases in the response concerning the Government's view of the importance of the case might well have been avoided, and the traditional cautionary language concerning not abandoning a conscientiously held view merely to return a verdict might well have been included. Disclosure of the second note might well have prompted counsel to suggest a response appropriately tailored to the circumstances of the juror who felt badgered, and surely would have permitted more focused argument in support of the motion for a mistrial. Disclosure of the third note would have afforded counsel an opportunity to suggest a specific response to the jury's significant request for an explanation of "how much involvement constitutes guilt."

*Ronder*, 639 F.2d at 934–35.

According to *Ronder*, the proper practice for a jury inquiry and response thereto is as follows: (1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it. *Id.* at 934.

The *Rogers* opinion, cited in *Ronder*, provides some useful teaching by the Supreme Court on the dangers of inducing unanimity through a misleading ex parte communication between court and jury. The jury in *Rogers* deliberated for two hours but returned a verdict of guilty within five minutes after the court, without any input from counsel, responded in the affirmative to a jury note inquiring whether the court would accept a verdict of guilty "with extreme mercy." 422 U.S. at 36, 95 S.Ct. 2091. The Supreme Court considered the response substantively erroneous for failure to advise that the recommendation was not binding and not part of the jury's function in any event. *Id.* at 40, 95 S.Ct. 2091. It noted, moreover, that the swift verdict following the response "strongly suggest[ed] that the trial judge's

response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise." *Id.*

■ It is well settled, however, that an ex parte communication by a judge to a jury in response to a jury inquiry may be considered harmless error where the communication cannot be said to have prejudiced the defendant. *See United States v. Adeniji,* 31 F.3d 58, 65 (2d Cir.1994). Our most recent finding of harmless error in such a situation came in *United States v. Henry,* 325 F.3d 93, 106–08 (2d Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 203, 157 L.Ed.2d 194 (2003), where the district court read to the parties a jury note indicating a deadlock, omitting the portion of the note setting forth the divided vote, and then delivered a modified *Allen* charge without affording counsel the opportunity to review the language to be used in the charge. We determined that the language used by the district court in its *Allen* charge was sufficient, and concluded: "In sum, the district court should have afforded defense counsel the opportunity to review the *Allen* charge before administering it to the jury. However, we decline to reverse [the defendant's] conviction, as he fail[ed]to demonstrate that he was prejudiced by the district court's error." *Id.* at 108.

Similarly, the absence of prejudice has been noted in ex parte responses where a jury requested certain tape recordings that had been received in evidence, and the response was characterized as an example of communications that "largely concern[ ] administrative matters," *United States v. Ballistrea,* 101 F.3d 827, 837 (2d Cir.1996); where an inquiry was made into the time a juror would leave for Sabbath worship, *United States v. Taylor,* 562 F.2d 1345, 1365 n. 12 (2d Cir.1977); and where an inquiry was made to avoid embarrassment of a juror, *United States v. Robinson,* 560 F.2d 507, 516–17 (2d Cir.1977) (en banc). We have even determined that prejudice was lacking in a court's ex parte response to a note announcing that a juror was not able to work past 6:30 P.M., the response asking whether it was "absolutely impossible" to continue and further stating "I said to you yesterday that we would work tonight, if necessary, and I feel that we must." *United States v. Blackmon,* 839 F.2d 900, 915 (2d Cir.1988). Thereafter, another note indicated agreement on a verdict on all counts but one, and, before the court could take any action on that note, yet another note from the jury, less than twenty-five minutes after the ex parte communication, reported a final verdict. Our absence of prejudice determination included a finding that "the judge's response [could not] fairly be construed as coercing the jurors to resolve differences among themselves [that] they had expressly concluded to be irresolvable." *Id.*

We think that the case before us is more akin to the situation we reviewed in *Krische v. Smith,* 662 F.2d 177, 180 (2d Cir.1981), where, in the context of a habeas corpus challenge to a state court conviction, we could not "say 'with fair assurance' that the basic error involved in the state court's ex parte communication with the jurors did not affect the verdict." In *Krische,* the jury resumed deliberations at 7:30 P.M. after a recess for dinner. The jury returned to render its verdict at 9:30 P.M. Before summoning the jury to report, however, the trial judge first informed counsel that at 8:10 P.M. the jury had sent a note indicating an inability to agree on a verdict. In response, the judge had instructed a court officer to deliver an oral message. *Id.* at 178. The officer testified that he conveyed the court's response to

the jury as follows: "'I told them the Judge said to continue deliberations. It's not soon enough.'" *Id.*

Critical to our analysis in *Krische* was the short length of the deliberations following the ex parte communication—one hour and twenty minutes. *Id.* at 179. We took special note of the "prejudice that can result when a jury is told to keep deliberating, but given no guidelines as to the balance required in the deliberations." *Id.* at 180. Despite the substantial evidence of guilt, the ex parte communication was an "error relat[ing] directly to the denial of an opportunity to be sure that the dissenting members of the jury understood the standard applicable to further deliberations at that critical juncture." *Id.*

█ In the case at bar, the District Court failed to respond to the message of deadlock, choosing only to advise that the division of the jury should not have been reported. The jury was thus deprived of necessary guidance, and counsel was deprived of the opportunity to insist on an *Allen* charge at that point in the deliberations. The standard governing further deliberation simply was not provided. By its failure to respond to the report of deadlock, the court in effect directed the jury to continue deliberations, which may have "induced unanimity," *Rogers,* 422 U.S. at 40, 95 S.Ct. 2091, for a guilty verdict. Although the court was prepared to deliver an *Allen* charge and expected to do so when the jury redacted the statement of the divided vote, the opportunity was lost when the verdict was returned a mere fifty minutes after the court's ex parte response.

It is difficult to speculate upon what the jury may have made of the court's response, especially in view of the fact that the highlighted page of the instructions given to the jury as a response included the following: "I will respond to any ques-

tions or requests you have as promptly as possible, either in writing or by having you return to the courtroom so I can speak with you in person in the presence of the parties and counsel." Worthy of note is the fact that the standard *Allen* charge, although it is intended to impel a verdict, instructs that "no juror should surrender his or her honest conviction as to the weight or the effect of the evidence to his fellow or her fellow jurors or for the purpose of returning a verdict." *Henry,* 325 F.3d at 106–07 (finding no error in court's failure to review specific wording of proper *Allen* charge with counsel before delivering the charge). This assures that those who have conscientious opinions for *either* side need not yield them in order to assure unanimity, and is thus equally fair to the Government and to the defendant. Rather than deliver an *Allen* charge in reply to the jury's note of impasse, the court responded ex parte by noting the impropriety of the statement of division. Under the circumstances of this case, especially the short span of time between the response and the verdict, *see Krische,* 662 F.2d at 179 (one-hour-and-twenty-minute delay between improper response and verdict considered critical factor in finding of prejudice), the ex parte response was inappropriate, substantially erroneous and prejudicial to Mejia.

█ Finally, it is generally accepted that "[t]he mere fact that the jury made known its division to the court, without more, is not grounds for a mistrial or a bar to the court giving the *Allen* charge." *United States v. Tanios,* 82 F.3d 98, 101 (5th Cir.1996). It appears that the District Court in the case at bar was unduly concerned that delivering an *Allen* charge may have "worked against Mejia's interests." *Mejia,* 200 F.Supp.2d at 330. However, Mejia's interests could have been protected in a number of ways. For

example, we have held that it is proper to redact material respecting a divided vote from a jury note. *See, e.g., Henry,* 325 F.3d at 106. The proper procedure (not just a better procedure as the District Court noted in its opinion) would have been to "summon[ ] the jury and deliver[ ] the *Allen* charge that had already been agreed upon as the course the [c]ourt would follow in this eventuality," *Mejia,* 200 F.Supp.2d at 329, after either redacting the statement of division or disclosing same to counsel in camera. *See Ronder,* 639 F.2d at 934; *Robinson,* 560 F.2d at 511. The failure of the District Court to follow this procedure cannot be considered harmless error. And this is so whether the proper standard for harmless error in this case is harmless beyond a reasonable doubt, *see Chapman v. California,* 386 U.S. 18, 26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), or fair assurance that the verdict was not affected, *see Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[3]

## CONCLUSION

The judgment of conviction is vacated, and the case is remanded to the District Court for further proceedings.

---

**3.** *See United States v. Evans,* 352 F.3d 65, 68–70 (2d Cir.2003) (holding harmless under either standard ex parte communication consisting of telephone call by trial judge to individual juror at home to verify medical condition, resulting in replacement by alternate juror *without notice to counsel*).