**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 26, 2005**

**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JEROME M. WENGER, also known
as Jerome Maxell Wenger,

Defendant-Appellant.

No. 04-4022

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 99-CR-260-PGC)**

Jerome H. Mooney, Mooney Law Firm, Salt Lake City, Utah (Vincent L.
Verdiramo, Verdiramo & Verdiramo, Jersey City, New Jersey, with him on the
briefs), for Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (Paul M. Warner, United States
Attorney, with her on the brief), Office of the United States Attorney, Salt Lake
City, Utah, for Plaintiff-Appellee.

Before **HARTZ** , **ANDERSON** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

**INTRODUCTION**

Defendant-Appellant Jerome Wenger published a newsletter called *The Next SuperStock* and hosted a syndicated radio program of the same name. After failing to inform his listeners that he had been receiving compensation from certain companies in exchange for touting their stocks on his show, he was indicted and convicted of securities fraud under Section 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b), which makes it unlawful to publicize a stock for consideration from an issuer, underwriter, or dealer without disclosing the fact and amount of the payment. In addition, for failing to inform readers of *The Next SuperStock* newsletter that he was selling his shares in the companies he had been recommending they buy, he was convicted under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), which makes it unlawful to employ any manipulative or deceptive device in connection with the sale of securities.

On appeal, Wenger challenges his convictions on the grounds that (1) Section 17(b) violates the First Amendment, (2) Section 17(b) is unconstitutionally vague, (3) his convictions were against the weight of the evidence presented at trial, (4) the district court impermissibly admitted evidence of a prior consent decree with the SEC, and (5) the district court failed to send the indictment to the jury room along with the jury instructions.

Accepting jurisdiction under 28 U.S.C. § 1291, we affirm.

-2-

## BACKGROUND

In 1984, Wenger began publishing *Penny Stock News*, a newsletter that gave investment advice concerning "penny stocks," or shares of small companies with large numbers of shares outstanding. After the Securities and Exchange Commission determined that Wenger's *Penny Stock News* had violated the disclosure requirements of Section 17(b) and Section 10(b) because he received money from companies he recommended, Wenger and the SEC entered into a consent decree that stipulated he would disclose the full value of any consideration he was receiving from any issuer about which *Penny Stock News* was giving advice.

Ten years later, Wenger began publishing a similar newsletter called *The Next SuperStock* and also began hosting a radio program based in Salt Lake City. To further these ventures, Wenger approached a company called PanWorld Minerals International, Inc. and told its management that he could help publicize its stock. After PanWorld expressed interest, Wenger offered to provide certain "consulting" services for a standard fee of $15,000. Because PanWorld could not compensate Wenger in cash, Wenger agreed instead to accept 5.5 million shares of PanWorld, of which he had received 2.1 million by April 1994.

In early 1994, Wenger consulted with a law firm to determine how he could comply with Section 17(b)'s disclosure requirements. In a letter dated June 28,

1994, the firm recommended a two-stage disclosure, according to which Wenger would first state on the air that he was a paid consultant to some of the companies mentioned, and second send details regarding his compensation to listeners upon request. Sometime in 1994 Wenger began to tell listeners that they could request a list of his stock holdings. In response to such requests, he would send a form letter, which stated, "I presently charge a company $16,000 for services which may include introducing them to market makers and stock brokers, introduction to newspaper and magazine writers, introduction to newsletter writers and exposure through the radio." The letter then stated that "[a]s far as my portfolio is concerned the following stocks I bought," among which was listed PanWorld.

PanWorld employees also appeared on Wenger's radio program several times in 1994. On June 18, 1994, Wenger stated on his show that PanWorld "is trading at book value and has a great direction to go, and that's north." On the same day, when interviewing PanWorld consultant David Hesterman, Wenger stated that "I know I've been doing some consulting and helping you to get more of a better broker network in place and you've seen a lot more people come on the sheets for you and do some significant trading." Hesterman and PanWorld president Robert Weeks, both of whom had appeared several times on Wenger's show, testified at trial that they had never heard Wenger disclose that he was being paid in PanWorld stock. Six regular listeners also testified that they had

never heard Wenger disclose the amount of stock he was receiving from PanWorld.

In June 1994, Wenger's newsletter published an article listing several reasons to buy PanWorld stock. The newsletter contained a standard fine print disclosure stating that *The Next SuperStock* or its employees "may purchase, sell, or have a position in the stocks discussed and may have a paid consulting arrangement with the companies." Wenger never disclosed in his newsletter that he had received 2.1 million shares in PanWorld or that he had contracted to receive up to 5.5 million shares.

By April 1994, Wenger had already begun selling the stock he had received from PanWorld. By the end of the summer he had sold over a million shares for a total of more than $100,000. In August, two of his brokerage accounts were oversold in PanWorld. Because "short selling" of a penny stock was illegal at the time, Wenger's broker bought enough stock to cover the short position at a lower price. Several listeners to Wenger's program testified that they bought PanWorld stock as a result of Wenger's recommendations. They also testified that had Wenger disclosed he was selling his PanWorld stock, they would not have bought any shares in PanWorld.

After the SEC began investigating Wenger's activities, Wenger's attorney submitted a letter to the SEC dated November 18, 1996. The letter included a

partial transcript of the June 18, 1994 broadcast, and argued that Wenger's statement that he "had been doing some consulting" for PanWorld was an adequate Section 17(b) disclosure. On November 27, 1996, after the SEC requested copies of all broadcast tapes in which PanWorld was discussed, counsel sent the SEC a second letter. This letter enclosed taped portions of the June 18, 1994 broadcast and a February 22, 1994 broadcast, and stated that "[i]t is our understanding that Mr. Wenger has conducted a diligent search and he has located no other tape recordings or transcripts thereof that refer or relate to PanWorld."

Wenger was indicted in 1999.

## DISCUSSION

We first must resolve a threshold issue posed by Wenger: Was his conduct protected from prosecution by the First Amendment. In other words, is Section 17(b) constitutional as applied to his speech?

Section 17(b) makes it unlawful for any person

> to publish, *give publicity* to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, *describes such security for a consideration received* or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without *fully disclosing the receipt*, whether past or prospective, of such *consideration and the amount* thereof.

15 U.S.C. § 77q(b) (emphasis added). According to Wenger, this provision unconstitutionally compels him to speak by requiring government-mandated

-6-

disclosures as a part of his communications with his readers or listeners. We review First Amendment challenges de novo, *Phelan v. Laramie County Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1246 (10th Cir. 2000).

## I. THE FIRST AMENDMENT

Wenger first claims that Section 17(b) impermissibly regulates non-commercial speech and thus should be subject to strict scrutiny review under the First Amendment. He claims that, as applied to him, this exacting scrutiny prohibits the government from compelling speech—the disclosures—required by Section 17(b). We disagree.

### A. Section 17(b) Regulates Commercial Speech

The initial question we must resolve is whether Section 17(b)'s reach is limited principally to commercial speech. If so, according to Supreme Court precedent it is subject to judicial review under the standard set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).

Neither the Supreme Court nor any of our sister circuits have addressed this question explicitly. Two circuit courts and one district court have upheld Section 17(b) against First Amendment attack, however. In 1971, the Seventh Circuit, although without explicitly determining what level of scrutiny it was applying, held that "[t]he substantial interest of the investing public in knowing whether an apparently objective statement in the press concerning a security is motivated by

promise of payment is obvious. We see no significant abridgement of freedom of the press in requiring disclosure of a promise of payment if there has been one." *United States v. Amick*, 439 F.2d 351, 365 (7th Cir. 1971).

Similarly, in *SEC v. Wall Street Publ'g Inst.*, 851 F.2d 365, 372–73 (D.C. Cir. 1988), the District of Columbia Circuit upheld the constitutionality of Section 17(b) under the federal government's broad powers to regulate the securities industry, without expressly linking its holding to the First Amendment.[1] As an aside, however, the court also suggested that Section 17(b)'s disclosure requirements would have been upheld as a regulation on commercial speech "even when the government has not shown that absent the required disclosure [the speech would be false or deceptive], or that the disclosure requirement serves some substantial government interest other than preventing deception." *Id.* at 373 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650 (1985)). Finally, in an unpublished opinion, a district court judge applied rational basis scrutiny to uphold Section 17(b). *SEC v. Huttoe*, No. Civ. A. 96-2543 (GK), 1998 WL 34078092 (D.D.C. Sept. 14, 1998).

Unfortunately, none of these cases helpfully analyzes more recent Supreme Court commercial speech jurisprudence. We begin there.

---

[1] Since *Wall Street Publishing*, the Supreme Court has rejected the idea that the power to extensively regulate in a certain area includes the authority to regulate speech without raising First Amendment concerns. *See 44 Liquormart v. Rhode Island,* 517 U.S. 484 (1996).

**1.**

Commercial speech is that which "does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748 (1976). Advertising is widely recognized as the most obvious example of commercial speech. *Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1546 (10th Cir. 1991). The distinction between commercial and non-commercial speech rests on the "common-sense" grounds that the former "occurs in an area traditionally subject to government regulation." *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 426 (1993) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978)). Commercial speech therefore occupies a "subordinate position in the scale of First Amendment values." *Ohralik*, 436 U.S. at 456; *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64-65 (1983). "[T]he State's power to regulate commercial transactions justifies its concomitant power to regulate commercial speech that is linked inextricably to those transactions." *44 Liquormart v. Rhode Island*, 517 U.S. 484, 499 (1996) (internal quotations omitted).

Typically state regulation of commercial speech must satisfy a form of intermediate scrutiny. *Central Hudson*, 447 U.S. at 564-65; *cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1944) (presuming that "regulatory legislation affecting ordinary commercial transactions . . . rests upon some

rational basis"). As the Supreme Court has explained, unlike ordinary commercial transactions, commercial speech deserves constitutional protection under the First Amendment because it "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson*, 447 U.S. at 561–62; *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). In other words, "the protection of commercial speech largely derives" from "the *listener's* First Amendment interests" as well as the speaker's. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 433–34 (1993) (Blackmun, J., concurring) (emphasis added).

No single formulaic test can be applied to the question of whether certain speech falls within the rubric of commercial speech. *See Bolger*, 463 U.S. at 67 n.14 and accompanying text. The Supreme Court has, however, stated that "[o]ur lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley v. Nat'l Fed'n of the Blind of North Carolina*, 487 U.S. 781, 796 (1988). In cases where commercial speech is "inextricably intertwined with otherwise fully protected speech," more substantial constitutional scrutiny will apply. *Id.*

**2.**

The Court has emphasized that it will review a "combination" of factors in sorting out commercial from non-commercial speech, including several characteristics of commercial speech that, in our view, help illuminate the issue. According to the Court, speech may properly be characterized as commercial speech where, among other things, (1) it is concededly an advertisement, (2) it refers to a specific product, or (3) it is motivated by an economic interest in selling the product. *See Bolger*, 463 U.S. at 66–67. In the context of securities regulation under Section 17(b), this inquiry is focused on the security and the relationship of the speaker to the issuer of the stock. Has the issuer bought and paid for the "speech" promoting the stock, or is the "speech" disinterested commentary of a stock's pros and cons?

We find that the speech Congress regulated through Section 17(b) fits well within the framework of *Bolger*. As the Supreme Court in *Bolger* observed, its cases instruct that we draw "common sense" distinctions between various kinds of speech. Common sense suggests that the nature of the speech regulated by Section 17(b) here is primarily akin to commercial advertising and subject to less protection than purely information-based speech. Paid promoters such as Wenger serve as the medium through which a company may promote its stock.

Although there are some elements of entertainment and information contained in the programs and newsletters, in the end, they do little more than

propose a commercial transaction, namely, the purchase of shares in a company. Moreover, while speech such as Wenger's is concededly not a traditionally structured advertisement, it does refer to a specific product (in this case PanWorld stock); the *raison d'etre* for PanWorld's inclusion in Wenger's newsletter and radio program is fundamentally premised on a direct economic relationship between the company and the promoter. Paid publicists such as Wenger have agreed to promote a security for a price. And Congress has made the reasonable policy judgment that the promoter disclose its relationship to the public.

**3.**

In his facial challenge, Wenger nevertheless argues that we ought to apply strict scrutiny because Section 17(b) may reach non-commercial expression. If Section 17(b) merely sought to regulate disinterested financial analysis, this argument might have some force. But as the district court noted, a common sense distinction also exists between disinterested analysis of the securities markets and compensated promotion of particular stocks. One example of the latter is found in *Lowe v. SEC*, 472 U.S. 181 (1985). In *Lowe*, the Supreme Court considered whether a publisher of "impersonal" investment advice and commentary could be enjoined under the Investment Advisors Act of 1940 because the publisher was not a registered investment advisor. *Id.* at 183. The Court stated, in dicta, that because the expression of an opinion about a commercial product, such as a

-12-

loudspeaker, is protected by the First Amendment, *see Bose Corp. v. Consumers Union*, 466 U.S. 485, 513 (1984), "it is difficult to see why the expression of an opinion about a marketable security should not also be protected." *Lowe*, 472 U.S. at 210 n.58.

In contrast to the speech at issue in *Lowe*, however, Section 17(b) regulates speech "which, though not purporting to offer a security for sale, describes such a security *for consideration received or to be received*, directly or indirectly, from an issuer, underwriter, or dealer." 15 U.S.C. § 77q(b) (emphasis added). While *disinterested* investment advice will still qualify for full First Amendment protection, paid publicists' speech is grounded in commercial transactions of the kind that the state has traditionally regulated. *Friedman v. Rogers*, 440 U.S. 1, 10 n.9 (1979). A lower level of constitutional protection is therefore justified than in the case of disinterested advice and commentary.

This would be true even if the speaker really "believed" in the stock or company he was promoting. It is undoubtedly the case a tout frequently believes in the products he promotes. The problem Congress sought to address, however, was not the bona fides of the publicist, but the scope of information available to the public. As in many areas where conflicts of interest are involved, the disclosure of the financial interests of the speaker can say volumes to the listener.

-13-

In any event, Section 17(b)'s disclosure requirement presents little risk that listeners will tune out a publicist's message. A promoter of the kind covered by Section 17(b) must wait for his audience to subscribe or tune in. A listener to a radio show or a reader of a newsletter is already in the act of seeking information; he is therefore unlikely to tune out the promoter's message just because the promoter makes a required disclosure. Even a casual observer of contemporary television's financial programming can see that Section 17(b) does not hamper the discussion of particular stocks, even those owned by a show's host or guests.

In sum, the disclosures required by Section 17(b) will be scrutinized as would any limitation on commercial speech.

**B. Application of Commercial Speech Scrutiny**

We recently summarized the Supreme Court's three-part test governing First Amendment challenges to regulations restricting non-misleading commercial speech that relates to lawful activity:

> First, the government must assert a substantial interest to be achieved by the regulation. *Central Hudson*, 447 U.S. at 564. Second, the regulation must directly advance that governmental interest, meaning that it must do more than provide "only ineffective or remote support for the government's purpose." *Id*. Third, although the regulation need not be the least restrictive measure available, it must be narrowly tailored not to restrict more speech than necessary. *See id.*; *Board of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). Together, these final two factors require that there be a reasonable fit between the government's objectives and the means it chooses to accomplish those ends. *United States v. Edge Broad. Co.*, 509 U.S. 418, 427–28 (1993).

-14-

*Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1237 (10th Cir. 2004).

In applying *Central Hudson*, we require the government first to prove that the law provides more than "ineffective or remote support for the government's purpose." *Central Hudson,* 447 U.S. at 564. We then distinguish between a regulation aimed at the activity the government seeks to prevent, and a "regulation aimed at something else in the hope that it would sweep [the targeted activity] in during the process." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 969– 70 (1984). This standard "does not require that the government's response to protect substantial interests be the least restrictive measure available. All that is required is a proportional response." *Mainstream Mktg,* 358 F.3d at 1238.

In the context of disclosure requirements, the Supreme Court has provided additional guidance. In *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), the Supreme Court upheld an Ohio rule that attorneys advertising their availability on a contingent-fee basis should reveal in their advertising that clients will have to pay costs even if their lawsuits are unsuccessful. In reaching this conclusion, the Court distinguished between statutes like Section 17(b) that compel disclosures from those that prohibit speech. It noted, in part, that "because disclosure requirements trench much more narrowly on an advertiser's interest than do flat prohibitions on speech, warnings or disclaimers might be

-15-

appropriately required . . . in order to dissipate the possibility of consumer confusion or deception." *Id.* at 651 (internal citation omitted). The Court concluded that an attorney's "constitutionally protected interest in not providing any particular factual information in his advertising is minimal," and thus found the disclosure requirement at issue was "*reasonably related* to the State's interest in preventing deception of consumers." *Id.* (citing *Central Hudson*) (emphasis supplied).

*Zauderer*, therefore, eases the burden of meeting the *Central Hudson* test. In assessing disclosure requirements, *Zauderer* presumes that the government's interest in preventing consumer deception is substantial, and that where a regulation requires disclosure only of factual and uncontroversial information and is not unduly burdensome, it is narrowly tailored. These principles are easily met here.

Section 17(b) contains two forms of disclosure: (1) that a promoter disclose his status as such, and (2) that a promoter disclose how much he is paid for his promotions. We discuss each separately since the former addresses slightly different interests than the latter.

## 1. Disclosure of the Payment

It is undisputed that the government has an interest in protecting consumers from being misled. *Illinois, ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S.

-16-

600, 612 (2003) ("[T]he First Amendment does not shield fraud."). Section 17(b) directly advances this interest because investors—such as the listeners to Wenger's radio program and readers of his newsletter who testified in this case—base their decisions whether to buy a stock in part on whether various opinions about the product are self-serving or not. By requiring publicists to disclose their interests, the government prevents investors from mistaking self-interested for disinterested advice. And as the Supreme Court suggested in *Lowe*, the "dangers of fraud, deception, or overreaching" are present not only in publicity that "contain[s] any false or misleading information," but also in publicity that is "designed to tout any security in which [publicists] ha[ve] an interest." *Lowe,* 427 U.S. at 209–10.

The disclosure requirement imposed by Section 17(b) is thus reasonably related to the goal of fraud prevention. A publicist who fails to disclose that he has an interest in the companies he promotes will almost always mislead his audience into thinking that his advice is disinterested. Similarly, we are influenced by the fact that the disclosure requirement applies only to those securities that a promoter has been paid to tout. The fact that the promoter must provide a disclaimer as to each security he touts at the time he promotes the security is only a minimal burden imposed by the statute.

-17-

Therefore, to the extent Section 17(b) requires stock publicists to disclose that they are receiving consideration from the companies they are promoting, it is tailored to prevent fraud and does not offend the First Amendment.

## 2. Disclosure of the Amount of Payment

The last question is whether Section 17(b) survives scrutiny to the extent it requires publicists to disclose the *amount* of consideration they are receiving. Wenger argues that disclosure of an interest ordinarily suffices to put listeners on notice that a publicist's advice may not be trustworthy.

In our view, however, by requiring publicists to disclose the amount of consideration they are receiving, Section 17(b) imposes only a de minimis additional disclosure burden on the paid promoter. Telling a listener or reader that the promoter has been bought and paid for, and for how much, directly informs prospective purchasers of the speaker's biases. The listener is free to make an informed investment decision in light of that knowledge. The "amount" requirement of Section 17(b) is a natural corollary to the disclosure of the speaker's status as a promoter. As such, its satisfies the requirement that there be a "reasonable fit" between the congressional objective and the statutory command.

In addition, Congress has a substantial interest through the securities laws in making capital markets more open and efficient. "It requires but little

appreciation of . . . what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail" in the securities industry. *Silver v. New York Stock Exchange*, 373 U.S. 341, 366 (1963); *and see* L. Auchincloss, *The Embezzler* (1966) (describing fictionalized 1930's stock promoter). Furthermore, "[i]n the eyes of some, the best way to achieve both fairness and efficiency is to give all investors equal access to all relevant information." *Dirks v. SEC*, 681 F.2d 824, 835 n.14 (D.C. Cir. 1982), *rev'd on other grounds*, 463 U.S. 646 (1983). In enacting Section 17(b), Congress could reasonably conclude the amount of consideration a publicist receives will influence a rational investor's decision whether to buy or sell a stock, because a publicist's recommendation will be given more or less weight depending on how much he stands to benefit from trumpeting a stock. Therefore, even if Section 17(b)'s requirement that publicists disclose the amount of consideration did impose some burden, such a burden is reasonably related to the government's interest in promoting open capital markets.

And as a final matter, the disclaimers at issue here impose little burden on speech. In the context of a half hour broadcast or multi-page newsletter, it takes only a slight effort to tell one's listeners or readers, "I have been paid 5.5 million shares of Pan World stock in exchange for putting the company on this show [or in this newsletter]." Appt. App. 58.

-19-

In sum, Section 17(b) does not violate Wenger's commercial speech rights. It allows publicists to still assert a message while advancing the consumer's interest in knowing the publicists' financial stake in promoting a stock, thereby reasonably advancing the government's interest in preventing deception and achieving more open securities markets. Accordingly, we reject Wenger's First Amendment challenge to Section 17(b).

## II. VAGUENESS

Wenger also argues that Section 17(b) is unconstitutionally vague. We review vagueness challenges de novo. *United States v. Agnew*, 931 F.2d 1397, 1403 (10th Cir. 1991).

A law is unconstitutionally vague if it fails to "enable ordinary people to understand what conduct it prohibits" or if it "encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech." *Smith v. California*, 361 U.S. 147, 151 (1959). Nonetheless, vagueness challenges rarely succeed against a statute that requires a showing of purpose or specific intent. *United States v. Welch*, 327 F.3d 1081, 1096 (10th Cir. 2003).

Wenger argues that the statute does not provide fair warning as to what disclosures are required to meet legal muster and when the disclosures must be

made. Section 17(b)'s mens rea requirement belies Wenger's contention that he did not have fair warning. In a Section 17(b) prosecution, the government must prove that the defendant acted "willfully." 15 U.S.C. § 77x. In criminal law, "a 'willful' act is one undertaken with a 'bad purpose.'" *Bryan v. United States*, 524 U.S. 184, 191-92 (1998). In some contexts, this may entail that the defendant knew his actions were illegal. *See*, *e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) (requiring proof of knowledge of illegality in a prosecution for illegal structuring of a currency transaction). In other contexts, however, especially when the prohibited conduct is *malum in se*, a "willful" act may entail only that the defendant intentionally undertook an act that he knew to be wrongful. *See*, *e.g.*, *United States v. Tarallo*, 380 F.3d 1174, 1187 (9th Cir. 2004) (distinguishing *Ratzlaf* and holding that a prosecution under the Securities Exchange Act of 1934 does not require proof of knowledge of illegality).

In either case, "willful" criminal conduct is at the very least conduct that no "ordinary person would engage in innocently." *Ratzlaf*, 510 U.S. at 660-61. It is well-settled that "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States*, 325 U.S. 91, 102 (1945). Finally, a "vagueness challenge to a penal statute based on insufficient notice

-21-

rarely succeeds where the requisite mental state is one of purpose or specific intent." *United States v. Welch*, 327 F.3d 1081, 1096 (10th Cir. 2003).

The disclosure provisions of the statute required two things from Wenger. First, it required him to disclose that he received payment for promoting a security. Second, it required disclosure of the amount of the payment. Neither disclosure is obscure or particularly difficult to understand. As mentioned above, a simple one-sentence statement can do the trick. Wenger did not make the required disclosures, and it is essentially undisputed that he knew of Section 17(b)'s requirements. Moreover, in this case, the jury specifically found that Wenger had acted with knowledge—i.e., he knowingly failed to make the requisite disclosures.

Even if Wenger could plausibly argue the statute was unclear as to when disclosure must be made, the evidence in this record shows that he misrepresented the amount of consideration he received from PanWorld. Wenger received, in fact, nearly $100,000 in stock for touting the company; he told his readers that he received a consulting fee of only $16,000. Thus, his later claim that he could not have reasonably known that his conduct was unlawful rings hollow.

The fact that Section 17(b) allows some flexibility in the structuring of the disclosure makes it easier to obey rather than unconstitutionally vague. As we have said, the "Constitution does not impose impossible standards of specificity

upon legislatures . . . Due process requirements are not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Welch*, 327 F.3d at 1094. Here, the statute does not lack "fair warning" of what disclosures are required.

Accordingly, we conclude that Section 17(b) is not unconstitutionally vague.

### III. SUFFICIENCY OF THE EVIDENCE

We next address Wenger's argument that the government did not present enough evidence at trial to convict him under either Section 17(b) or Section 10(b). We review sufficiency of the evidence claims de novo. *United States v. Lazcano-Villalobos*, 175 F.3d 838, 843 (10th Cir. 1999). Viewing the evidence in the light most favorable to the government, we ask whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995).

#### A. Section 17(b) of the Securities Act of 1933

Wenger urges us to reverse his Section 17(b) conviction on the grounds that the government's only evidence that he failed to disclose the amount of consideration he was receiving from PanWorld was a three-minute taped snippet

from the June 18, 1994 broadcast. In the broadcast, Wenger fails to disclose the fact that he received compensation from PanWorld for promoting its stock or the amount given to him.

The record before us, however, shows that the government presented ample additional evidence. First, Weeks, Hesterman, and six regular listeners, three of whom testified on behalf of Wenger, all denied that they had ever heard Wenger disclose the amount of consideration he had received from PanWorld. This is direct evidence that the requirements of Section 17 had not been met.

Second, the parties' stipulation of facts included Wenger's lawyer's statement to the SEC that Wenger could not produce any examples of PanWorld being discussed on his show other than the three-minute snippet from the June 18, 1994 broadcast and portions of the February 22, 1994 broadcast. A reasonable jury could have inferred from this stipulation that the three-minute snippet contained the entire discussion of PanWorld from the June 18, 1994 broadcast. Given that Wenger never disclosed the amount of consideration he had received from PanWorld during the three-minute snippet, a reasonable jury could therefore have found beyond a reasonable doubt that Wenger had failed to make an adequate Section 17(b) disclosure, at least as to the June 18, 1994 broadcast.

In light of this evidence on non-disclosure, Wenger argues that the jury should have acquitted him because he relied in good faith on the advice of his

-24-

counsel. Good faith reliance on counsel is a defense to the mens rea element of a criminal prosecution under the Securities Act of 1933. *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 181-82 (2d Cir. 1976). The mens rea element is defined in Section 24 of the Act, 15 U.S.C. § 77x, which states that the government must prove that the defendant "willfully violate[d]" the Act's provisions. If the jury finds that the defendant relied in good faith on the advice of counsel, it may acquit him on the grounds that the defendant's conduct was not willful. *United States v. United Medical & Surgical Supply Corp.*, 989 F.2d 1390, 1403 (2nd Cir. 1992).

Good faith reliance on counsel, however, is not a complete defense, but is merely one factor a jury may consider when determining whether a defendant acted willfully. *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 683 (4th Cir. 1967). In the Tenth Circuit, to establish a good faith reliance on counsel defense, the defendant must show "(1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from counsel that the action to be taken will be legal, and (4) reliance in good faith on counsel's advice." *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429 (10th Cir. 1988).

We conclude that a reasonable jury could have rejected Wenger's good faith reliance on counsel defense. First, Wenger did not establish that he

disclosed all relevant facts to his attorneys. In particular, if Wenger had wanted to avoid future Section 17(b) prosecutions, he would have disclosed to his attorneys that in 1984 he and the SEC had entered into a consent decree governing how he would comply with Section 17(b) in the future. Nonetheless, John Dougherty, one of the lawyers who in 1994 recommended the two-stage disclosure process, testified that he did not know that Wenger had once entered into a consent decree with the SEC that governed Wenger's disclosures. Although Dougherty believed that his partner would have known about the consent degree, Wenger did not present any evidence to substantiate Dougherty's opinion. Wenger therefore did not establish that he had disclosed all relevant facts to his counsel, and thus failed to negate the government's showing of willfulness.

Secondly, the evidence showed that Wenger also failed to accurately disclose to recipients the amount of compensation received. Wenger disclosed (inaccurately) his consulting fee, which far understated the value of the stock given to him for touting PanWorld. Finally, Wenger's prior encounters with the SEC regarding paid promotion for touting belie any lack of knowledge and undercut his claim that he relied on counsel in making the inadequate disclosures at issue here.

On this record, a reasonable jury had sufficient evidence to convict Wenger.

### B. Section 10(b) of the Securities and Exchange Act of 1934

Section 10(b) makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC has explained that a "manipulative or deceptive device" includes "mak[ing] any untrue statement of a material fact or [omitting] a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5.

Wenger argues that the government did not have enough evidence of fraudulent intent to convict him under Section 10(b). Fraudulent intent is an element of a Section 10(b) offense. *United States v. Mackay,* 491 F.2d 616, 619 (10th Cir. 1973). It need not be proven directly, but may be inferred from the facts and circumstances surrounding a defendant's actions. *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997).

We find that the government presented sufficient evidence to convince a reasonable jury beyond a reasonable doubt that Wenger had intent to defraud. The record shows that at the same time as Wenger had been advising his readers

to buy PanWorld stock, Wenger himself was selling his shares.  By touting the stock in his newsletter, Wenger stood to make a larger profit from its sale, and, as a sophisticated penny-stock investor, knew that information concerning his own sale of PanWorld would materially affect the investment decisions of his listeners. Indeed, three investors who listened to Wenger's radio program testified that had they known that he was selling all his PanWorld stock, they themselves would not have bought it.  *See SEC v. Huttoe*, 1998 WL 34078092 (D.D.C. 1998) (describing similar scheme).  Under these circumstances, the jury could have reasonably concluded that Wenger intended to mislead his listeners.

Wenger did present evidence that his brokerage account was oversold in PanWorld, which ordinarily indicates that an investor is hoping that the stock will go down rather than up.  Wenger's broker, however, testified that the oversold account may have been an error, given that shorting a penny stock was illegal at the time.  A reasonable jury could have inferred from this testimony that Wenger did not intend to short his stock in PanWorld, and thus remain convinced that Wenger had fraudulent intent to mislead his clientele.

## IV.  EVIDENCE OF PAST BAD ACTS

Next, Wenger argues that the district court improperly admitted evidence of past bad acts.  In particular, he contests the admission into evidence of the following statement:  "In 1984 the Securities and Exchange Commission found

that Penny Stock Newsletter, Inc. and Jerome M. Wenger willfully violated section 17(b) of the Securities Act of 1933."

We review the admission into evidence of past bad acts for abuse of discretion. *United States v. Rackstraw*, 7 F.3d 1476, 1478 (10th Cir. 1993). Federal Rule of Evidence 404(b) states that evidence of past bad acts may not be admitted as character evidence, but may be admitted for other purposes. To determine whether evidence of past bad acts was properly admitted, we ask whether "(1) the evidence was offered for a proper purpose; (2) the evidence was relevant; (3) the trial court determined under Fed. R. Evid. 403 that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave the jury proper limiting instructions upon request." *United States v. Hill*, 60 F.3d 672, 676 (10th Cir. 1995) (citing *Huddleston v. United States*, 485 U.S. 681 (1988)).

The record makes clear that the contested statement was introduced for the purpose of rebutting Wenger's defense of good faith reliance on counsel. In addition, the contested statement was relevant to the question of whether Wenger had revealed all material facts to his counsel. Finally, the trial court gave the jury a limiting instruction he requested. Therefore, as Wenger concedes, the district court's ruling satisfied prongs (1), (2), and (4) of the *Huddleston/Hill* test.

Wenger nonetheless claims that the district court failed to satisfy prong (3) because it failed to determine whether the probative value of the evidence outweighed its potential for prejudice under Rule 403.  We have firmly held that to satisfy prong (3) a district court need not make an explicit Rule 403 ruling, so long as the determination as to prejudice is supported by the record. *United States v. Lazcano-Villalobos*, 175 F.3d 838, 847 (10th Cir. 1999) ("Although explicit findings are clearly preferable, under the facts of this case we conclude the district court must have implicitly made a Rule 403 finding when it contemplated Mr. Lazcano-Villalobos' unfair prejudice and probative value argument.").  In this case, the record shows that the government had to submit evidence of the SEC's earlier decision in order to rebut Wenger's contention that he had disclosed all relevant facts to his counsel.  While the contested statement may have had a potential for prejudice, the record supports the view that its prejudice did not substantially outweigh its probative value.

Furthermore, the trial transcript reveals that the district court was aware of the potential for prejudice.  Not only did the district court, in response to Wenger's objections, refuse to admit into evidence the entire 1984 consent decree, but, before Wenger's attorney even asked, the court offered to give a limiting instruction.  It is clear the district court, in fact, considered the contested statement's potential for prejudice.  Accordingly, we find no error.

## V. FAILURE TO SEND THE INDICTMENT TO THE JURY

Finally, Wenger argues that the district erred in failing to send the indictment to the jury. We review a trial court's decision not to send the indictment to the jury for abuse of discretion. *United States v. Skolek*, 474 F.2d 582, 586 (10th Cir. 1973).

Contrary to Wenger's allegations, the record in this case shows that the district court did indeed send the indictment to the jury. Immediately after the jury was sent to the jury room, the judge said "I think we need to double-check our exhibits. I'm also sending back the verdict form that everyone has agreed to and the Indictment." Aplt. Br. Vol. VII at 1033. Wenger points out that neither the docket nor the index of exhibits shows that the indictment was sent to the jury, but he fails to explain why this inventory proves his point. Absent any convincing evidence to the contrary, we have no basis for concluding that the indictment was unavailable to the jury.

## CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.