**F I L E D**

**UNITED STATES COURT OF APPEALS**

**July 6, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BOBBY DALE KELLEY,

Defendant-Appellant.

No. 05-5040

(N.D. Oklahoma)

(D.C. No. 03-CR-154-HDC)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

On December 9, 2004, a jury convicted Bobby Dale Kelley of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. In light of his two previous felony drug convictions, the district court sentenced him to life imprisonment. On appeal, Mr. Kelley challenges (1) the district court's treatment of the jury's note indicating it was deadlocked, (2) the sufficiency of evidence supporting his conviction, and the admission at trial (3) of evidence of a subsequent criminal conviction and (4)

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

certain rebuttal testimony. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

In July 2002, police officers initiated a drug investigation connected to Kristopher Covey. Officers later obtained a warrant to search for firearms and ammunition at Mr. Covey's residence in Claremore, Oklahoma. Two houses were located on the property to be searched: a smaller House A and a larger House B. Police obtained a search warrant only for Mr. Covey's residence, House B. The warrant did not mention Mr. Kelley.

On the evening of September 9, 2002, Claremore Police Officer John Singer and members of the Twelfth District Drug Task Force executed the search warrant at House B. Inside the home, police found firearms, surveillance equipment, and evidence of methamphetamine manufacture and distribution. In the living room, officers found several items used to manufacture methamphetamine, including reagents, solvents, liquid iodine, peroxide, starting fluid, and plastic gloves. Rec. vol. III, at 36, 38. In the southeast bedroom, Officer Singer found two guns, methamphetamine residue, cold medicine containing pseudoephedrine, and precursors and reagents used to manufacture methamphetamine. *Id.* at 36-37. In the northeast bedroom, officers discovered a glass pipe used to smoke methamphetamine, a picture of Mr. Kelley inside House

A, a television monitor connected to a surveillance system, a letter addressed to Mr. Kelley, and a bolt-action rifle without any bullets. *Id*. at 41-45; Rec. vol. IV, at 96-97. Police also came across a schoolbook and a few items of clothing in the northwest bedroom, indicating that Mr. Kelley's daughter had lived there. Rec. vol. III, at 46.

Prior to the search, Officer Singer had talked to Don Charles, who owned the property on which both houses were located. Mr. Charles gave police permission to search the metal horse barn located between Houses A and B. During the September 9 search, officers searched the barn and discovered two plastic tack boxes emanating an odor. Officers believed these boxes had been used to manufacture methamphetamine. Mr. Charles did not own the boxes. That evening, officers obtained an additional search warrant for the boxes and subsequently found "a complete, large-scale methamphetamine production laboratory" inside the boxes. *Id*. at 49. Items in the boxes included red phosphorus, a flask, pH papers, iodine, sodium hydroxide, drain cleaner, solvents, rubber tubing, and an electric hot plate. *Id*. at 49-57.

Following the evening search on September 9, officers waited in the dark for someone to return to House B. Mr. Covey arrived at the residence shortly after midnight and was taken into custody. He waived his *Miranda* rights and spoke to police. Mr. Covey stated that Mr. Kelley was on his way to the residence with ephedrine to manufacture methamphetamine. Phone records

confirmed that the two men had talked at 11:57 p.m. that evening. Rec. vol. IV, at 83-84, 163. Officers remained at the property until 3 a.m., but Mr. Kelley did not show up. Mr. Kelley was eventually arrested for a warrant in Florida on July 30, 2003.

A superceding indictment charged Mr. Kelley with conspiracy to manufacture at least 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. Before trial, the government notified Mr. Kelley of its intent to use two prior felony drug convictions to enhance his sentence: (1) unlawful possession of a controlled drug (October 1997); and (2) unlawful possession of a controlled dangerous substance with intent to distribute (February 1998). The government also informed Mr. Kelley before trial that it would introduce evidence of his subsequent methamphetamine conviction in Florida. The parties stipulated that Mr. Kelley was convicted on September 11, 2003 of felony methamphetamine possession. The district court admitted the evidence and gave a limiting instruction to the jury.

At Mr. Kelley's trial in December 2004, Mr. Covey provided extensive testimony about manufacturing methamphetamine with Mr. Kelley and another individual named Mike Helton.[1] In April 2002, Mr. Helton brought Mr. Kelley

---

[1]At Mr. Kelley's trial, Mr. Covey stated that he had pleaded guilty to felony possession of a firearm in furtherance of a drug trafficking crime, and he was testifying in order to cooperate with the government. Rec. vol. IV, at 132.

over to House B and taught Mr. Covey how to cook methamphetamine. Rec. vol. IV, at 135-36. Mr. Covey testified that during this first meeting Mr. Helton "was in control" and Mr. Kelley "pretty much just helped him out." *Id.* at 137. On the first night together, they manufactured approximately 100 grams of methamphetamine and divided it into three portions. *Id.* at 139. Mr. Covey estimated that the three men subsequently had cooked methamphetamine 15 to 20 times together, producing 60 to 90 grams each time. *Id.* at 142, 145. Each time, they equally divided the cooked methamphetamine between them. *Id.* at 145-46. Mr. Covey testified that Mr. Kelley and he manufactured methamphetamine without Mr. Helton approximately five times, also producing 60 to 90 grams each time and equally dividing the product. *Id.* at 142, 145-46. The cooking was always done at the Claremore residence, and each of the three men contributed necessary manufacturing items when they cooked together. *Id.* at 144. At some point, Mr. Covey and Mr. Kelley began cooking without Mr. Helton because he had stopped bringing ingredients. *Id.* at 151-52. Mr. Covey stated that he had kept equipment used to cook methamphetamine in two boxes in a metal horse barn. *Id.* at 161-62.

Mr. Covey also testified that, in mid-July 2002, Mr. Kelley moved in with him at House A. The two men moved into House B in August 2002. In House B, Mr. Covey stayed in the southeast bedroom and Mr. Kelley stayed in the northeast bedroom. *Id.* at 149. While Mr. Kelley stayed at House B, his girlfriend and

daughter also stayed there.

Mr. Charles, owner of the two rental houses and the barn, testified that he had rented House A to Mr. Covey during the summer of 2002. In August 2002, Mr. Covey moved into the larger of the houses, and an individual named "Uncle Bobby" lived with him. *Id*. at 190-91. Mr. Charles occasionally saw "Uncle Bobby" when he visited the property, and he identified after the search a photograph of Mr. Kelley as the man who lived with Mr. Covey and had been called "Uncle Bobby." *Id*. at 77-78.

Mr. Kelley called five witnesses in his defense, and he elected not to testify during trial. His brother, Bryan Kelley, testified that he visited the Claremore residence in late August 2002 to pick up his brother's and niece's belongings because Mr. Kelley had moved to Tahlequah and his daughter had moved to Coweta. Rec. vol. IV, at 205-08. David Kelley, the defendant's father, stated at trial that his son lived with him in Coweta until early August 2002 and then moved to Claremore. *Id*. at 256-57, 259. Mr. Kelley later moved to the family's Tahlequah farm during Labor Day weekend in 2002. *Id*. at 259. Ben Clavet testified that Mr. Kelley was at the Tahlequah farm from early September through November of 2002. *Id*. at 254-55.

As rebuttal evidence, the government offered testimony of Gayla Eldridge, Mr. Kelley's former girlfriend. Mr. Kelley objected to the introduction of her rebuttal testimony, but the court overruled the objection. Ms. Eldridge testified

that Mr. Kelley and she started living at Mr. Covey's residence in late July 2002, and Mr. Covey and Mr. Kelley cooked methamphetamine there. *Id.* at 298, 301, 303.

After hearing testimony for three days, the jury began deliberations on the afternoon of December 8, 2004. The next day, the jury continued deliberations but Mr. Kelley's counsel, Jack Gordon, had to leave for a family emergency. Robert Ridenour, an Assistant Federal Public Defender, replaced Mr. Gordon and represented Mr. Kelley during the remaining jury deliberations. Mr. Kelley agreed to the situation, and Mr. Gordon remained available by cell phone.

At 4:20 p.m. on December 9, the jury informed the court that it could not reach a verdict. The court read the note to counsel and stated "I propose to let them stay in there until about a quarter till 5:00, and then I propose to call them into the courtroom . . . and give them . . . a modified *Allen* charge." Rec. vol. V, at 394. After further discussion with counsel, the district court stated:

> Well, it seems to . . . me we ought to give this *Allen* charge. Wait until about a quarter of 5:00, give this, [and] send them home. And this is one that you give at the end of the day. The other *Allen* charge is you send them immediately back to consider, but because it's this time I think this probably is more appropriate.

*Id.* at 400. The court allowed Mr. Ridenour to contact Mr. Gordon by cell phone to discuss how to proceed. In the meantime, at 4:36 p.m. the jury sent another note, indicating it had reached a verdict. The jury announced the verdict at 4:45 p.m. It found Mr. Kelley guilty of conspiracy to manufacture 500 grams or more

of methamphetamine.

On March 17, 2005, the district court sentenced Mr. Kelley to mandatory life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(viii) ("[A]fter two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release.").

Mr. Kelley timely appeals the judgment and sentence on four separate grounds. He maintains (1) the district court's failure to inquire promptly into the deadlocked jury's note at 4:20 p.m. led to a coerced verdict; (2) the government failed to present sufficient evidence to convict him of the conspiracy; (3) the court improperly allowed the government to offer evidence of his 2003 conviction for methamphetamine possession; and (4) the court abused its discretion when it allowed Ms. Eldridge to testify as a rebuttal witness for the government. We separately examine each challenge below.

## II. DISCUSSION

A.    Challenge to the court's treatment of the deadlocked jury's note

The Supreme Court approved of a supplemental jury instruction to a deadlocked jury in *Allen v. United States*, 164 U.S. 492, 501-02 (1896). Courts have subsequently given *Allen* or "dynamite" charges "to encourage unanimity (without infringement upon the conscientious views of each individual juror) by urging each juror to review and reconsider the evidence in light of the views

expressed by other jurors." *United States v. Smith*, 857 F.2d 682, 683-84 (10th Cir. 1988).

We generally review a district court's decision to give an *Allen* charge for an abuse of discretion. *United States v. Reed*, 61 F.3d 803, 805 (10th Cir. 1995). However, because Mr. Kelley did not object below to the district court's failure to give an *Allen* charge, we review this issue for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993). To establish plain error, a defendant must show (1) an error (2) that is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732-33 (10th Cir. 2005) (en banc).

Mr. Kelley contends that the district court should have immediately questioned the deadlocked jury, and this failure to make a proper inquiry of the jurors caused a potentially coerced verdict because the jury had no guidance from the court. We reject these arguments and conclude the court's treatment of the jury's note was not plain error. "[A] court is not required to accept the judgment of a jury that is hopelessly deadlocked, and may require it to continue deliberating." *Gilbert v. Mullin*, 302 F.3d 1166, 1174 (10th Cir. 2002) (internal quotation marks omitted). The note at 4:20 p.m. did not compel the court to issue an *Allen* charge or to declare a mistrial immediately, and the court did not abuse its discretion when it proposed to allow the jury 25 minutes of additional deliberation while Mr. Ridenour contacted Mr. Gordon. Even if we construe the

court's response–not to advise the jury until 4:45 p.m.–as an implicit instruction to continue deliberations, the jury was never tainted with an impermissibly coercive charge that suggested a particular outcome.

Moreover, we can distinguish the facts here from Mr. Kelley's principal authority for his argument that the court should have promptly examined the jury and delivered an *Allen* charge. In *United States v. Mejia*, 356 F.3d 470, 473 (2d Cir. 2004), a jury deadlocked 11 to 1 indicated to the district court at 2:10 p.m. that it could not reach agreement. Without consulting counsel for the parties, the court sent to the jury a copy of one page of the jury instructions. The court highlighted the following sentences from the jury instructions: "Do not specify what the verdict is in the note. . . . If you are divided do *not* report on how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court." *Id*. The court did not provide further guidance or an *Allen* charge. At 3:00 p.m., the jury reached a verdict.

The Second Circuit acknowledged that the court's failure to respond directly to the deadlocked message "deprived [the jury] of necessary guidance." *Id*. at 477. In vacating the verdict, however, the circuit focused almost exclusively on the prejudicial nature of the judge's ex parte response and the defense counsel's inability to request an *Allen* charge after the deadlocked jury's note. *Id*. The Second Circuit characterized the court's ex parte response as "inappropriate, substantially erroneous and prejudicial" to the defendant, and of

-10-

particular concern was "the short span of time between the [court's ex parte] response and the verdict." *Id.*

Here, the district court similarly did not respond to the deadlocked jury with immediate advice. An important distinction, though, is that the court here did not communicate ex parte with the jury. It instead informed both parties of the jury's note from 4:20 p.m. and proposed to counsel an additional 25 minutes of jury deliberations. The court also provided time for Mr. Ridenour to contact Mr. Gordon to discuss the proposed *Allen* charge. Sixteen minutes later, the jury reached its verdict. Such treatment of the jury's note is not plain error.

B.     Challenge to the sufficiency of the evidence

Mr. Kelley moved for a judgment of acquittal at the end of the government's case, challenging the sufficiency of the evidence under Fed. R. Civ. P. 29(a). The district court denied the motion. Mr. Kelley did not renew the motion at the conclusion of all the evidence, but he now raises the issue on appeal. "[I]f no motion for acquittal is made at the close of all evidence, we nevertheless review [a challenge to the sufficiency of the evidence on appeal] for plain error under Fed. R. Crim. P. 52(b)." *United States v. Bowie*, 892 F.2d 1494, 1496 (10th Cir. 1990). For challenges to the sufficiency of evidence, however, the plain-error standard is "essentially the same as if there had been a timely motion for acquittal." *Id.* at 1497. In both circumstances, we engage in "an independent review of the legal question of sufficiency." *Id.* (quotation marks

omitted).  Therefore, even though we review the issue for plain error, we still determine "whether, taking the evidence–both direct and circumstantial, together with reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find [the] [d]efendant guilty beyond a reasonable doubt." *United States v. Bass*, 411 F.3d 1198, 1201 (10th Cir. 2005), *cert. denied*, 126 S. Ct. 1106 (2006).  "We do not weigh conflicting evidence or evaluate witness credibility; these are the exclusive province of the jury." *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005).

"Under 21 U.S.C. § 846, the Government must prove beyond a reasonable doubt: (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1083 (10th Cir. 2004).  "A jury may infer guilt from the surrounding circumstances and presume that a defendant acting in furtherance of a conspiracy is a knowing participant therein.  An agreement may be inferred from circumstantial evidence that indicates concerted action." *Id.*  To be reasonable, however, the inference of an agreement must be more than mere speculation and conjecture. *See United States v. Jones,* 44 F.3d 860, 865 (10th Cir. 1995).

Mr. Kelley primarily contends that the government did not present sufficient evidence that a conspiracy was established to manufacture at least 500

-12-

grams of methamphetamine. He maintains that evidence only showed a suspicion that he conspired to manufacture the charged amount. In a conspiracy, "the critical inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists." *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992) (internal quotation marks omitted). Because "direct evidence of a conspiracy is often hard to come by[,] . . . conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action." *Dazey*, 403 F.3d at 1159.

Viewed in the light most favorable to the government, the evidence is sufficient to support the jury's conviction. Although no government witness testified about an express agreement between Mr. Kelly and Mr. Covey or Mr. Helton to manufacture at least 500 grams of methamphetamine, the prosecution presented ample evidence to allow the jury to infer reasonably that such an agreement existed. Mr. Covey testified that (1) Mr. Kelley and he had cooked 60 to 90 grams of methamphetamine approximately five times, and (2) those two men and Mr. Helton had cooked 60 to 90 grams of methamphetamine an estimated 15 to 20 times. Rec. vol. IV, at 142, 145-46. Mr. Kelley contributed items such as ephedrine and iodine when the three men cooked methamphetamine. *Id.* at 144. The jury also could have believed Mr. Covey's testimony that, when he was

taken into custody on the night of the search, Mr. Kelley was returning to the Claremore residence with ephedrine to manufacture methamphetamine. *Id.* at 163.

Further, the jury could have inferred from the evidence that Mr. Kelley had lived at Mr. Covey's residence where the methamphetamine laboratory was located. Inside House B, officers found numerous items used to manufacture methamphetamine, along with guns and a surveillance system. Mr. Covey testified that Mr. Kelley had stayed in the southeast bedroom, where officers had discovered two guns, cold medicine containing pseudoephedrine, and several precursors and reagents used to cook methamphetamine. Rec. vol. III, at 36-37. Mr. Charles, the owner of the rental property, had seen Mr. Kelley at the property occasionally, and Mr. Covey had told him that Mr. Kelley lived with him. Rec. vol. IV, at 190-91. Although "[m]ere presence at the scene of a crime does not, by itself, prove involvement in an existing conspiracy, . . . [it] is a material factor." *United States v. Hamlin*, 986 F.2d 384, 386 (10th Cir. 1993) (internal quotation marks omitted).

In light of the trial testimony and physical evidence found during the search, a jury could have reasonably inferred that Mr. Kelley conspired to manufacture at least 500 grams of methamphetamine.

C.     Challenge to the admission of evidence of a 2003 drug conviction

Before trial the government filed a notice of intent to offer evidence of Mr.

Kelley's 2003 conviction for felony possession of methamphetamine. The

government wanted to introduce the evidence in its case-in-chief under Fed. R.

Evid. 404(b) to "prove that [Mr.] Kelley was a user of methamphetamine who had

knowledge of methamphetamine, as well as motive, intent, and a plan to

manufacture methamphetamine, in part, to support his habit of use." Rec. vol. I,

doc. 20, at 2. Rule 404(b) prohibits the admission "of other crimes, wrongs, or

acts . . . to prove the character of a person in order to show action in conformity

therewith." FED. R. EVID. 404(b). Such evidence "may, however, be admissible

for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident." *Id.*

Mr. Kelley filed a motion in limine to preclude admission of the evidence

of his conviction, arguing that his unrelated conviction for personal-use

possession of methamphetamine did not tend to prove his guilt for the charged

conspiracy offense. The district court denied the motion during a pre-trial

conference. The parties later stipulated at trial that Mr. Kelley had pleaded guilty

on September 11, 2003 to felony possession of methamphetamine in Florida.

Soon after announcing the stipulation, the court provided a limiting instruction to

the jury. It stated that evidence of the 2003 conviction "should be considered by

you solely for limited purposes and considered only as it may assist you in

making a determination as to motive, knowledge, intent, or absence of mistake

when you consider the conduct and actions of the defendant. It is not proof of the

-15-

crime charged itself in the indictment." Rec. vol. IV, at 202-03. Before entering into the stipulation, Mr. Kelley's counsel noted that he had "argued a motion in limine and argued that [evidence of the 2003 conviction] should not be admitted, and the Court [had] overruled that motion." *Id.* at 202.

On appeal, Mr. Kelley maintains that the court abused its discretion by admitting evidence of the earlier crime. The government argues that Mr. Kelley did not renew his objection at trial and we should review the evidentiary ruling only for plain error. "Generally, a pretrial motion in limine will not preserve an objection if the objection is not renewed at the time the evidence is introduced." *United States v. Nichols*, 169 F.3d 1255, 1264 (10th Cir. 1999). "[A]n exception to this rule . . . applies only where the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge." *Id.* (internal quotation marks omitted).

Regarding the first factor, the parties here adequately presented the matter to the district court. The government filed its notice of intent to offer the Rule 404(b) evidence, and Mr. Kelley responded with a motion in limine to exclude it. Second, the decision to admit the evidence "is of the type that can be finally decided in a pretrial hearing," as the court decided it was not a "very fact-bound determination[] dependent upon the character of the evidence introduced at trial." *United States v. Mejia-Alarcon*, 995 F.2d 982, 987 (10th Cir. 1993). Finally, the

court's minute sheet indicates that it definitively denied Mr. Kelley's motion in limine during a pre-trial conference prior to jury selection. *Cf. McEwen v. City of Norman*, 926 F.2d 1539, 1543-44 (10th Cir. 1991) (concluding that a plaintiff needed to renew an objection at trial where the court had expressly reserved ruling on a motion in limine until trial). Because all elements of the exception are satisfied, Mr. Kelley did not need to renew at trial his objection. We consequently review the court's evidentiary ruling for an abuse of discretion. *United States v. Wenger*, 427 F.3d 840, 855 (10th Cir. 2005).

In assessing a challenge to the admission of 404(b) evidence, we determine whether "(1) the evidence was offered for a proper purpose; (2) the evidence was relevant; (3) the trial court determined under Fed. R. Evid. 403 that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave the jury proper limiting instructions upon request." *Id.* (referencing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). Though the 2003 conviction occurred *after* the charged conspiracy offense, our evaluation under *Huddleston* is the same. *United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006); *see also United States v. Anifowoshe*, 307 F.3d 643, 646-47 (7th Cir. 2002) ("[B]y its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts.").

1.    *Purpose*

We begin with the first *Huddleston* factor–whether the evidence was

-17-

offered for a proper purpose. Here, the government sought admission of the 2003 conviction to show Mr. Kelley's knowledge of the methamphetamine, his intent to enter into a conspiracy to manufacture the drug, and his motive, which the government maintains was "in part[] to support his habit of use." Rec. doc. 20, at 2. As a general rule, to prove intent in conspiracy cases, the government may offer evidence of similar relevant acts; it need not await the defendant's denial of intent. *See United States v. Harrison*, 942 F.2d 751, 760 (10th Cir. 1991); *see also United States v. Youts*, 229 F.3d 1312, 1319 (10th Cir. 2000) (approving the admission of evidence of a prior bad act under Fed. R. Evid. 404(b) to prove intent in a 18 U.S.C. § 1992 prosecution for wrecking a train).

Although our court has not addressed the precise issue here–whether a *subsequent* conviction for drug possession in an amount consistent with personal use could be introduced against a defendant charged in a conspiracy to manufacture the same drug–we have generally "allow[ed] the introduction of *prior* drug transactions to prove intent, knowledge, motive, and absence of mistake in drug prosecutions." *United States v. Russell*, 109 F.3d 1503, 1507 (10th Cir. 1997) (emphasis added). In our view, a subsequent conviction may be introduced for that same purpose. *See Mares*, 441 F.3d at 1157 (stating that "[s]ubsequent acts evidence is particularly relevant when a defendant's intent is at issue").

Case law from other circuits supports this conclusion. In *United States v.*

-18-

*Davidson*, 195 F.3d 402, 408 (8th Cir. 1999), a defendant charged with conspiracy to manufacture methamphetamine tried to exclude evidence at trial of his recent conviction for possession of methamphetamine. The circuit concluded that "[e]vidence of a defendant's prior possession of drugs in amounts consistent with personal use is admissible to show [his] knowledge and intent when intent is an element of the offense charged. This evidence is admissible even if the defendant has not raised a defense based on lack of knowledge or lack of intent." *Id.* (citations and quotation marks omitted).

Similarly, the Fifth Circuit held that a district court did not abuse its discretion in concluding that the defendant's "prior conviction for possession of cocaine [was] relevant to his intent in the charged [conspiracy] offense" because a defendant not pleading guilty to a conspiracy offense "raises the issue of intent sufficiently to justify the admissibility of extrinsic offense evidence." *United States v. Gadison*, 8 F.3d 186, 192 (5th Cir. 1993) (internal quotations omitted); *see also United States v. Butler*, 102 F.3d 1191, 1196 (11th Cir. 1997) (permitting the introduction of evidence "of prior personal drug use to prove intent in a subsequent prosecution for distribution of narcotics [because] [i]ntent is clearly at issue in a conspiracy prosecution"). *But see United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1015 (9th Cir. 1995) (prohibiting the admission of evidence of prior personal-use possession of methamphetamine for a defendant charged with possession of hydriodic acid with knowledge that it would be used to manufacture

-19-

methamphetamine, and "hold[ing] that evidence that the defendant used methamphetamine, or possessed a small amount of the drug, does not tend to prove that he participated in a conspiracy to manufacture it").

Based on our precedent and the rationale of most circuits that have addressed the issue, we conclude that evidence of a defendant's subsequent conviction of personal-use possession may be offered to establish knowledge or intent in a conspiracy prosecution involving the same drug. Use of the conviction to establish motive was also proper. *See, e.g.*, *United States v. Hatfield*, 815 F.2d 1068, 1072-73 (6th Cir. 1987) (allowing the introduction of 404(b) evidence to prove motive in a general-intent crime). Because the evidence was introduced for a proper purpose, we move on to assess the other *Huddleston* requirements.

2. *Relevance*

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Our court has found a prior bad act "relevant when that conduct is close in time, highly probative, and similar to the activity with which the defendant is charged." *United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (internal quotation marks omitted). Here, the 2003 conviction meets this standard. The conviction occurred only one year after the charged conspiracy, and both offenses involved the same drug–methamphetamine. Evidence of the subsequent conviction helped

-20-

to refute Mr. Kelley's defense of lack of intent, and it "also helped to explain [his] motive for entering the conspiracy and to rebut the suggestion of his mere presence at the scene." *United States v. Rush*, 240 F.3d 729, 731 (8th Cir. 2001) (concluding that a court did not abuse its discretion in admitting evidence of a prior amphetamine possession in a charged conspiracy to manufacture methamphetamine); *see also Davidson*, 195 F.3d at 408 ("A necessary element of conspiracy to manufacture methamphetamine is knowingly joining such a conspiracy, and [the defendant's] recent convictions for possession of methamphetamine were relevant to prove that.").

3.    *Weighing probative value and prejudice*

As to the third factor, the district court did not explicitly state the probative value of the 2003 conviction outweighed its prejudice. However, when the evidence was admitted, the court clarified to the jury that the 2003 conviction should be considered only to determine "motive, knowledge, intent, or absence of mistake" in the charged offense. Rec. vol. IV, at 202-03. We owe the district court "substantial deference in 403 rulings," *United States v. Shumway*, 112 F.3d 1413, 1422 (10th Cir. 1997) (internal quotation marks omitted), and we cannot say the court abused its discretion here when it implicitly determined the evidence was probative to the charged offense and not unduly prejudicial.

4.    *Limiting instruction*

Finally, under the fourth factor, the district court provided a limiting

instruction to the jury after it admitted the evidence.

Accordingly, the district court did not abuse its discretion in admitting evidence of Mr. Kelley's 2003 possession conviction.

D.     Challenge to the admission of rebuttal evidence by Mr. Kelley's girlfriend

"Rebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof. The fact that testimony would have been more appropriately offered during the proponent's case-in-chief does not preclude its admission as rebuttal evidence." *United States v. LiCausi*, 167 F.3d 36, 52 (1st Cir. 1999). "Rather, the decisions as to what constitutes proper rebuttal evidence and the order in which the parties present their evidence lie within the sound discretion of the trial judge and are subject to substantial deference." *Id.*

The government called Mr. Kelley's former girlfriend, Ms. Eldridge, as a rebuttal witness. An officer handling the case had information about Ms. Eldridge from Mr. Covey one year earlier, but he first learned of her last name a few days before trial. The officer found Ms. Eldridge, subpoenaed her, and interviewed her during the first day of trial. During the third day of testimony, she testified that Mr. Kelley and she began living with Mr. Covey in Claremore on July 28, 2002, and during that time the two men cooked methamphetamine.

Mr. Kelley's counsel objected to Ms. Eldridge's testimony as a rebuttal witness, but the court overruled the objection and allowed her to testify. The court later commented on the admission of the testimony:

[O]ne of the reasons that I permitted the evidence to be presented is because the evidence was not available during the time that the Government was putting on its principal evidence.

From the evidence that has been presented, it's apparent that the first interviews occurred when this trial was already in being. The second interview was the second day, and this is the third day, and I was a little more lenient that I might otherwise have been because of the fact that the Government had not had the opportunity and that there was no claim of surprise or prejudice other than the evidence itself.

Rec. vol. IV, at 323.

We review the court's admission of rebuttal testimony for an abuse of discretion. *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 2005). "A district court possesses considerable discretion in governing the presentation of evidence, and its decisions will not be disturbed absent manifest injustice to the parties." *Comcoa, Inc. v. NEC Telephones, Inc.*, 931 F.2d 655, 663 (10th Cir. 1991). Mr. Kelley maintains that Ms. Eldridge's evidence should have been presented in the government's case-in-chief because (1) it was repetitive of the evidence already presented and (2) Mr. Kelley had not contested on cross-examination that he had cooked methamphetamine with Mr. Covey.

While Ms. Eldridge's testimony "would have been more appropriately offered during the [government's] case-in-chief," *LiCausi*, 167 F.3d at 52, the admission of her rebuttal testimony did not cause manifest injustice to Mr. Kelley's defense. No evidence in the record suggests bad faith by the prosecution to withhold Ms. Eldridge's testimony until rebuttal, and Mr. Kelley still had an

adequate opportunity to cross-examine her.  Given the unusual temporal circumstances leading to Ms. Eldridge's rebuttal testimony, the court did not abuse its discretion in admitting it.

## III.  CONCLUSION

Accordingly, we AFFIRM Mr. Kelley's conviction and sentence.


Entered for the Court,


Robert H. Henry
Circuit Judge